Leonard Weintraub (LW 7258)
Joseph E. Gasperetti (JG 2120)
PADUANO & WEINTRAUB LLP
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

COBALT MULTIFAMILY INVESTORS I, LLC,
COBALT MULTIFAMILY CO. I, LLC,
COBALT CAPITAL FUNDING, LLC
and VAIL MOUNTAIN TRUST,
by ANTHONY PADUANO as Receiver,

                            Plaintiffs,

                 -against-

MARK A. SHAPIRO, IRVING J. STITSKY,
WILLIAM B. FOSTER, ROBERT F. COHEN,
COHEN & WERZ, LLC, MARTIN P. UNGER,
CERTILMAN BALIN ADLER & HYMAN, LLC,
LUM, DANZIS, DRASCO & POSITAN, LLC and
PHILIP L. CHAPMAN,

                           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

06 CV 6468

**COMPLAINT**

**Jury Trial Demanded**

RECEIVED
AUG 25 2006
U.S.D.C. S.D. N.Y.
CASHIERS

        Cobalt Multifamily Investors I, LLC ("Cobalt Multifamily"), Cobalt

Multifamily Co., I, LLC, Cobalt Capital Funding, LLC ("Cobalt Funding") and Vail

Mountain Trust ("Vail") by Anthony Paduano, as their Court-appointed Receiver, allege:

## Introduction

1.     On March 27, 2006, the United States Securities and Exchange Commission (the "SEC") filed an enforcement action in the United States District Court for the Southern District of New York, entitled <u>Securities and Exchange Commission v. Cobalt Multifamily Investors I, LLC, Cobalt Multifamily Co. I, LLC, Cobalt Capital Funding, LLC, Mark A. Shapiro, Irving J. Stitsky, William B. Foster and Vail Mountain Trust</u>, 06 CV 2360 (MBM) (the "SEC Action").

2.     Also on March 27, 2006, agents of the Federal Bureau of Investigation (the "FBI") arrested defendants Mark A. Shapiro ("Shapiro"), Irving J. Stitsky ("Stitsky"), and William B. Foster ("Foster") based on a sealed complaint charging them with conspiracy to commit securities fraud, wire fraud and mail fraud. <u>United States of America v. Shapiro, Stitsky and Foster</u>, 06 MAG 0397.  On April 24, 2006 a grand jury returned an indictment against those three individuals on similar charges.

3.     On March 28, 2006, Chief Judge Mukasey of the Southern District of New York issued an order appointing Anthony Paduano to act as temporary receiver (the "Receiver") for Cobalt Multifamily, Cobalt Multifamily Co. I, LLC, and Cobalt Funding, and Vail.  On July 20, 2006, the Court issued a further order making the appointment permanent.

4.     This action arises out of the fraudulent offering of securities by Cobalt Multifamily, one of a network of Cobalt affiliated companies (as defined below) controlled by defendants Shapiro, a convicted felon, Stitsky, also a convicted felon, and Foster.  Shapiro and Stitsky engaged in the conduct complained of as set forth herein

while they were on parole after serving prison sentences for federal fraud convictions. Between approximately November 2003 and March 27, 2006, Cobalt Multifamily raised more than $22 million from some 316 investors on the basis of misrepresentations and material omissions in its offering and marketing materials and through boiler-room sales tactics overseen by Stitsky. Among other things, defendants Shapiro, Stitsky and Foster: (a) grossly misrepresented Cobalt's track record and the fundamental nature of Cobalt's operations; (b) concealed Shapiro's and Stitsky's roles and criminal backgrounds and promoted the false impression that Foster ran the Cobalt entities; (c) used Cobalt as their personal piggy bank, misappropriated millions of dollars of investor funds, and spent lavishly on themselves, including buying fancy cars, jewelry, and luxury homes; and (d) operated Cobalt Multifamily as a Ponzi Scheme, using funds of later investors to pay earlier investors a promised 8% annual return.

5.     Through this conduct, defendants Shapiro, Stitsky and Foster engaged, directly or indirectly, in transactions, acts, practices, and courses of business which constitute violations of Sections 12(a) and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77l(a) and 77o, and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. In addition, Stitsky unlawfully associated with a broker-dealer in contravention of SEC orders barring him from such association.  None of the Cobalt entities ever registered an offering or class of securities under the Securities Act as was required.

6.  This action also seeks to recover money damages for the injuries sustained by Cobalt as a consequence of the legal malpractice of Cobalt's outside lawyers:  Robert F. Cohen, Esq. ("Cohen"), and his law firm Cohen & Wurtz, LLC ("Cohen & Werz"), Martin P. Unger, Esq. ("Unger"), and his law firm Certilman Balin Adler & Hyman, LLC ("Certilman"), Philip L. Chapman ("Chapman") and his law firm, Lum, Danzis, Drasco & Positan, LLC ("Lum Danzis") (collectively, the "Professional Defendants").  In their capacities as duly licensed professionals retained by Cobalt to render legal advice to the corporate entities, the Professional Defendants breached their duties of care to Cobalt and thereby committed numerous acts of professional negligence.  For example, in violation of their contractual and professional duties to Cobalt, Chapman, Lum Danzis, Unger, and Certilman drafted and amended the documents used by Shapiro, Stitsky and Foster to solicit funds and defraud Cobalt and its investors, and Unger and Certilman issued opinion letters that aided and facilitated the schemes of Shapiro, Stitsky and Foster.  These Professional Defendants failed to have their clients comply with the clear registration and disclosure requirements of federal law.  Moreover, Cobalt's offering documents failed to disclose that:

(1) Shapiro and Stitsky were convicted felons;

(2) Shapiro, who had previously had a multimillion dollar judgment entered against him for civil fraud, and Stitsky controlled Cobalt;

(3) Cobalt lacked any financial statements or operating revenues and was operating as a Ponzi Scheme;

(4) investor funds were being misused for personal purposes;

(5) Cobalt was the subject of Department of Justice and SEC investigations and that certain of Cobalt's funds and documents had been seized by federal authorities in 2005; and

(6) Cobalt's securities offerings were not registered as required and Cobalt's sales activities were unlawful.

**The Parties**

7.      The Receiver is a citizen and resident of New York County.

8.      Defendant Shapiro is a natural person who, on information and belief, is 47 years old and a citizen of the State of Connecticut.  Shapiro is currently incarcerated in the Federal Metropolitan Detention Center in Brooklyn, New York awaiting trial.  At all times relevant to this action, Shapiro acted on his own behalf and purportedly on behalf of Cobalt.

9.      In December 1998, Shapiro pleaded guilty to one count of bank fraud and one count of conspiracy to commit tax fraud. He was sentenced to serve 30 months in prison and ordered to pay restitution of $353,896 and a fine of $10,000.  See United States v. Mark Shapiro, 98 CR 242 (AVC) (D. Conn.).

10.      On information and belief, Shapiro was released from prison on parole on or about September 24, 2003.  Shapiro's conditions of parole prohibited him from, inter alia, (a) committing another crime, and (b) associating with any person convicted of a felony.  As set forth below, Shapiro violated his conditions of parole by committing other crimes and associating with Stitsky, a convicted felon.

11.      Defendant Stitsky is a natural person who, on information and belief, is 51 years old and a citizen of the State of New York, residing in Bayside, New York.  At all times relevant to this action, Stitsky acted on his own behalf and purportedly on behalf of Cobalt.

12.    In 1998, on the basis of his conduct from 1990 through August 1995 while associated with Stratton Oakmont, Inc. ("Stratton Oakmont"), a notorious boiler-room, Stitsky consented to an SEC order finding that he had violated the anti-fraud provisions of the Securities and Exchange Acts, ordering him to disgorge in the amount of $22,716, fining him $18,500, barring him from association with any broker, dealer, investment company, investment adviser, or municipal securities dealer, and directing that he cease and desist from any future securities law violation.  See In the Matter of Eric S. Blumen, Jordan I. Shamah and Irving Stitsky, Exchange Act Release No. 40333 (Aug. 18, 1998).

13.    In an NASD regulatory proceeding arising out of Stitsky's misconduct at Stratton Oakmont, in July, 1998, Stitsky consented to be censured and publicly barred from the securities industry, and agreed to pay a $100,000 fine in July 1998.

14.    From December 1995 -- almost immediately after he left Stratton Oakmont -- through March 1996, Stitsky acted as an undisclosed broker for another boiler-room operation, where he was alleged to have engaged in securities fraud, conspired to commit securities fraud and wire fraud, and received bribes for selling worthless securities.  In June 2000, Stitsky was indicted for his role in such scheme.  In August 2001, he pleaded guilty to criminal charges, including conspiracy to commit securities fraud, and was sentenced to 21 months imprisonment and a three-year period of supervised release.  See United States v. Dacunto, et al., 00 CR 620 (GEL) (S.D.N.Y.).

15.    In the SEC's administrative proceeding against him in the <u>Dacunto</u> scheme, Stitsky was again found to have violated the anti-fraud provisions of the Securities and Exchange Acts, and ordered to cease and desist from any future securities law violation, and barred from participating in a penny stock offering and associating with a broker or dealer.  See <u>In the Matter of Piazza, et al.</u>, Exchange Act Release No. 48497 (September 17, 2003).

16.    In August 1999, Stitsky was indicted on conspiracy to commit tax fraud, money laundering and tax fraud.  In August 2001, Stitsky pleaded guilty to conspiracy to commit tax fraud.  See <u>United States v. Napolitano, et al.</u>, 99 CR 00755 (JS) (E.D.N.Y.)

17.    In August 1999, the SEC brought an administrative proceeding against Stitsky in connection with the <u>Napolitano</u> action, which the SEC described as a "pump and dump" scheme.  In July 2005 Stitsky was again found to have violated the antifraud provisions of the Securities and Exchange Acts, and ordered to disgorge in the amount of $441,583, fined $110,000, ordered to cease and desist from any future securities law violation, and barred from participating in a penny stock offering and associating with a broker or dealer.  See <u>Securities and Exchange Commission v. Napolitano</u>, 99 Civ. 04807 (JS) (E.D.N.Y.).

18.    In August 2001, a criminal information was filed against Stitsky for making false statements, to which he pleaded guilty.  See <u>United States v. Stitsky</u>, 01 CR 938 (JS) (E.D.N.Y.).

19.    In February 2002, Stitsky was sentenced to 33 months in jail and three years probation in both the Napolitano and Stitsky actions. Such sentence was to be served consectively for 18 months and concurrently for 15 months with the Dacunto sentencing.

20.    In November 2003, Stitsky again was indicted for securities fraud, money laundering, and conspiracy to commit securities fraud, mail fraud, and wire fraud. See United States v. Collardeau, et al., 03 CR 00800 (WGB) (D.N.J.). That case is still pending.

21.    On information and belief, Stitsky was released from prison in the fall of 2004.

22.    The facts set forth in paragraphs 9 through 21 hereof were known to Cohen, Cohen & Werz, Certilman and Unger and, on information and belief, also were known to Lum Danzis and Chapman.

21.    Defendant Foster is a natural person who, on information and belief, is 66 years old and a citizen of the Commonwealth of Massachusetts, residing in Williamsburg, Massachusetts. At all times relevant to this action, Foster acted on his own behalf and purportedly on behalf of Cobalt.

22.    Defendant Cohen, on information and belief, is a citizen of the State of Connecticut, residing in Bristol, Connecticut. Cohen is admitted to the bar and authorized to practice law in the State of Connecticut.

23.    Defendant Cohen & Werz is a limited liability company organized under the laws of the State of Connecticut, with its principal place of business at 580 Broad Street, Bristol, Connecticut 06010-6663. Cohen & Werz is a law firm.

24.     Defendant Unger, on information and belief, is a member of Certilman (as defined below) and a citizen and resident of the State of New York. Unger is admitted to the bar and authorized to practice law in the State of New York.

25.     Defendant Certilman is a limited liability company organized under the laws of the State of New York, with its principal place of business at 90 Merrick Avenue, East Meadow, New York 11554.  Certilman is a law firm.

26.     Defendant Lum Danzis is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business at 103 Eisenhower Parkway, Roseland, New Jersey 07068-1049.  Lum Danzis is a law firm.

27.     Defendant Chapman, on information and belief, is a partner of Lum Danzis and a citizen and resident of the State of New Jersey.  Chapman is admitted to the bar and authorized to practice law in the State of New Jersey.

### Jurisdiction and Venue

28.     This Court has original and exclusive jurisdiction over Plaintiffs' claims brought under the Exchange Act, 15 U.S.C. § 78aa.

29.     This Court has original jurisdiction over Plaintiffs' claims brought under the Securities Act, 15 U.S.C. § 77v.

30.     This Court has original subject matter jurisdiction of this proceeding pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction) because (a) the action is commenced by the Receiver appointed by this Court in the SEC Action, and (b) this action forms part of the same case or controversy under Article III of the United States Constitution as the SEC Action.

31.    This Court has personal jurisdiction over Foster, because, on information and belief, on or about February 9, 2005, Foster caused Cobalt marketing materials to be sent to investors in New York County, New York, in furtherance of the fraudulent scheme described herein.

32.    This Court has personal jurisdiction over Shapiro because, on information and belief, on or about March 22, 2005, Shapiro placed a telephone call from Massachusetts to at least one Cobalt investor in furtherance of the fraudulent scheme described herein.

33.    This Court has personal jurisdiction over Shapiro, Stitsky and Foster because, on information and belief, on or about September 26, 2005, they caused an advertisement designed to induce inquiries from prospective Cobalt investors to be published in The New York Times in New York County, New York, in furtherance of the fraudulent scheme described herein.

34.    This Court has personal jurisdiction over Stitsky because he took affirmative steps that directly caused injury to Cobalt investors in this District that, on information and belief, a reasonable person would have understood would cause such damage and injury.

35.    This Court has personal jurisdiction over the Professional Defendants because they each took affirmative steps that directly caused injury to Cobalt investors in this District that, on information and belief, a reasonable person would have understood would cause such damage and injury.  Specifically, on information and belief, the Professional Defendants each took affirmative steps to assist in the preparation and marketing of private placement memoranda that were provided to

-10-

Cobalt investors in this District, in connection with the Ponzi Scheme set forth below.

36.    Venue is proper in this District pursuant to 15 U.S.C. § 77(a) because the securities that are the subject of this lawsuit were offered and sold to Cobalt investors resident in this District.

37.    Venue also is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred here.  The amount in controversy, exclusive of interest and attorneys' fees, exceeds $75,000.

## Background Facts

### A. Relevant Persons and Entities

38.    At all relevant times, Cobalt Multifamily was a limited liability company organized under Delaware law with its principal place of business in Springfield, Massachusetts. Cobalt Multifamily purportedly was engaged in the acquisition and development of multifamily real estate properties throughout the United States, including the rehabilitation and conversion of such properties into condominium-hotels.  Cobalt Multifamily raised capital for its purported operations through sales of securities to public investors. Such securities included so-called "Units" of "Class A Membership Interests" (the "Units").

39.    At all relevant times, Cobalt Multifamily Co. I, LLC ("Cobalt Co.") was a limited liability company organized under Delaware law and was identified in offering materials as the "Manager" of Cobalt Multifamily.

40.    At all relevant times, Cobalt Funding was a limited liability company

-11-

organized under Delaware law with its principal place of business in Great Neck, New York.  Cobalt Funding's primary business was marketing and selling the Cobalt Multifamily Units to the investing public.  According to marketing materials distributed by Cobalt Funding, Cobalt Funding was a part-owner-and so-called "Class B Member" of Cobalt Multifamily.

41.    At all relevant times, Cobalt Capital Partners, L.P. ("Cobalt Capital") was purportedly a limited partnership organized under Delaware law with its principal place of business in Springfield, Massachusetts.

42.    At all relevant times, Cobalt Financial, Inc. ("Cobalt Financial") was a corporation organized under Delaware law with its principal place of business in Springfield, Massachusetts, and was identified in certain offering materials as the "Manager" of Cobalt Co. which, in turn, was identified as the "Manager" of Cobalt Multifamily.  Cobalt Financial purportedly was owned and controlled by Foster, but was in fact controlled by Shapiro.

43.    At all relevant times, Cobalt Construction Services, LLC ("Cobalt Construction") was a limited liability company organized under Delaware law with its principal place of business in Springfield, Massachusetts.

44.    At all relevant times, Cobalt Property Services, LLC ("Cobalt Property") was a limited liability company organized under Delaware law with its principal place of business in Springfield, Massachusetts.

45.    At all relevant times, Vail purported to be a trust established under Connecticut law which was under the control of Shapiro.  Vail purportedly owns approximately 80 percent of Cobalt Financial and owns approximately 79 percent of

-12-

Cobalt Capital, the two entities that purportedly control other Cobalt entities including Cobalt Funding and Cobalt Construction. On information and belief, Defendant Cohen served as trustee of Vail.

46.    Cobalt Multifamily, Cobalt Co., Cobalt Funding, Cobalt Capital, Cobalt Financial, Cobalt Construction, Cobalt Property, Vail, along with other Cobalt-affiliated entities, are collectively referred to herein as "Cobalt."

47.    At all relevant times, Shapiro, along with the contrivance of Stitsky and Foster, controlled all of the Cobalt entities either personally or through Vail and exercised day-to-day management decisions as the de facto Chief Executive Officer of the Cobalt entities.

48.    At all relevant times, Stitsky supervised operations at the Cobalt Funding offices in Great Neck, New York, and was responsible for recruiting, training, and supervising the Cobalt employees who marketed the Cobalt Multifamily Units to the public.  Stitsky also sold directly to prospective investors.

49.    At all relevant times, Foster was identified in Cobalt marketing materials and private placement memoranda as the Owner, President and Chief Executive Officer of Cobalt Financial, the entity that purportedly ran Cobalt Multifamily, and as the individual responsible for overseeing all aspects of the operations of all of the Cobalt entities.

## B.  The Scheme to Defraud

50.    From at least as early as in or about November 2003 to on or about March 28, 2006, Shapiro, Stitsky, Foster and Cohen perpetrated a scheme to defraud investors by soliciting  millions of dollars of funds under false pretenses, failing to invest investors' funds as promised, and misappropriating and converting investors' funds to their own benefit and the benefit of others without the knowledge or authorization of the investors.  In furtherance of the scheme, Shapiro, Stitsky, and Foster solicited and caused others to solicit more than 300 investors who purchased approximately $22 million of Cobalt Multifamily Units.  Shapiro, Stitsky and Foster fraudulently induced these victims to invest by, among other things: (a) misrepresenting Cobalt's financial and operating history; (b) failing to inform prospective investors that Cobalt was owned and controlled by Shapiro, a convicted felon; (c) failing to inform prospective investors that Stitsky, also a convicted felon, was part of Cobalt's senior management; and (d) causing others to grossly misrepresent to prospective investors Cobalt's purported ownership interests in numerous properties that Cobalt did not own.

## C.  The Private Placement Memoranda and Marketing Materials

51.    In connection with the scheme, Shapiro, Stitsky and Foster distributed and caused others to distribute various materials to potential investors. Among those materials were at least three versions of a private placement memorandum which described the investment being offered.  The first private placement memorandum was dated December 29, 2003 ("the December 2003 PPM"). The second private placement memorandum was dated July 1, 2004 ("the July 2004 PPM") and a third private placement memorandum was dated December 15, 2004 ("the

December 2004 PPM"). The July 2004 PPM and the December 2004 PPM are collectively referred herein as the "2004 PPMs". The December 2003 PPM and the 2004 PPMs are collectively referred herein as the "PPMs".

52. Other materials distributed to potential investors included glossy brochures that described Cobalt and some of the properties in which investors would be investing, including properties that Cobalt did not own.

53. The December 2003 PPM, which was prepared principally by Lum Danzis, informed prospective investors that Cobalt Capital Partners I sought start-up working capital from investors and had been formed to pursue and promote investment opportunities in the acquisition and development of "well chosen multi-family properties."

54. The December 2003 PPM represented to prospective investors that Cobalt Capital Partners was managed by Cobalt Financial, Inc, whose President was Foster.

55. The December 2003 PPM did not disclose (a) that Shapiro, a convicted felon, had organized and controlled the affairs of Cobalt Capital Partners, or that (b) Stitsky, a recidivist federal felon, controlled the fund raising efforts of Cobalt.

56. The December 2003 PPM misrepresented to investors that funds raised would be held in escrow in an account controlled by Lum Danzis until a minimum of $700,000 had been raised in connection with the offering. In fact, investor proceeds were distributed immediately to Cobalt Capital and no investor funds were ever escrowed by Lum Danzis.

-15-

57.    The 2004 PPMs informed prospective investors, including all Class A Members, that Cobalt Multifamily was primarily focused on "the acquisition and development of residential apartment properties ranging in size from approximately 150 to 500 units and vacant land suitable for development of multifamily units."

58.    The 2004 PPMs further represented that: (a) Cobalt Multifamily was selling Class A limited liability company membership interests in Cobalt Multifamily in $100,000 "units" in an offering of between 20 and 250 units; (b) until the minimum offering of $2 million (or 20 units) was sold, all checks received from investors would be held in escrow; and (c) Foster "is the owner, President and CEO of Cobalt Financial, Inc." and "is in charge of overseeing all aspects" of the operations of Cobalt Financial and its "Affiliates," including all Cobalt entities.

59.    The July 2004 PPM made no mention of either Shapiro or Stitsky, or their roles at Cobalt.

60.    The December 2004 PPM made no mention of Stitsky, and falsely stated that Shapiro was merely a "consultant" who

> assists in structuring of [sic] the financing for the Cobalt Capital Companies. He has extensive experience in corporate finance and real estate and provides an eye for finding "diamond in the rough" properties. Mr. Shapiro has over twenty years of real estate construction, development and finance experience. He has on his own and on behalf of others, owned, managed, constructed and/or converted over 10,000 apartments and condominium units throughout the United States. He received his undergraduate degree from the University of Miami and a Masters in Finance from Harvard University.

61.     All of the material allegations in the above-referenced paragraph were materially false and misleading, and the Professional Defendants knew, or should have known them to be so.

62.     Shapiro was not a Cobalt "consultant."  In fact, Shapiro owned and controlled Cobalt through his interest in Vail. Shapiro ran Cobalt's day-to-day operations and made all significant business decisions for Cobalt.  Foster was the president and CEO in name only and at most had a 20% ownership in Cobalt Financial.

63.     Moreover, Shapiro did not own, manage, construct and/or convert over 10,000 apartments and condominium units throughout the United States. On information and belief, Shapiro had very little experience owning, managing, constructing and/or converting apartments and condominium units.

64.     Additionally, representations about Shapiro's educational background were false.  Shapiro did not attend or receive any degree from Harvard University.

65.     Shapiro, Stitsky and Foster -- through the brochures and other marketing materials distributed by Cobalt, with the express approval and consent, and at the direction of Shapiro, Stitsky and Foster -- represented to Cobalt investors that Cobalt was a nationally recognized real estate investment and property management firm run by real estate professionals with a long and highly successful track record. Such claims were false.

66.     For example, glossy brochures distributed to Cobalt investors described Cobalt as "an outgrowth of, and successors to, a group of earlier real estate

-17-

entities, most notably Capital Construction, Inc." and represented that Cobalt is "comprised of seasoned, business-oriented individuals who have owned, managed and developed more than $2 billion worth of real estate," during the past 24, or, in some materials, 30 years.  Such claims were utterly false.

67.    To bolster Cobalt's claimed track record, sales people provided Class A Members and prospective investors with illustrations depicting tombstone ads showing the purchase and sale prices for eight extremely profitable "private joint ventures" that purportedly were "sponsored by Cobalt Capital Companies" in the 1990s, generating a total of in excess of $60 million in profits.  All such representations were false, because none of the Cobalt entities were incorporated in the 1990s, and none of the Cobalt properties were purchased until 2005.

68.    Cobalt investors and prospective investors also were sent a four-page "Cobalt Capital Portfolio Summary" that showed the status and purported appreciated value or sale price of over fifty properties. All but five of the listed properties were purportedly acquired in the 1980s and 1990s and sold by 2003, at extremely impressive returns. The listed "average annual return" ranged from 9% to 204% over periods ranging from one to 12 years, including several with average annual returns of more than 200% in less than two years.  Such summary showed profits of millions of dollars.  Again, all such representations were false, because none of the Cobalt entities were incorporated until 2003, and none of the Cobalt properties were purchased until 2005.

69.    These representations about Cobalt's history were false and misleading.  In fact, Cobalt had no track record; it was a two-year-old start-up company

with no operating history.  All the Cobalt entities for which investments were solicited were incorporated in late-2003 or later, and all the personnel involved with the marketing and management of Cobalt, including Shapiro, Stitsky, and Foster, joined the Company within the last two years. Except for two of the numerous properties identified in the "Portfolio Summary," none of the listed properties was ever owned by Cobalt or a legal predecessor to Cobalt.

70.     The marketing and legal materials also misrepresented the then current state of Cobalt's business to Cobalt investors.  For example, the Portfolio Summary and other materials distributed to Cobalt investors and prospective investors in 2005 indicated that, since 2001, Cobalt owned five properties in Miami Beach (including one formerly known as the Simone Hotel) that were in various stages of development, that each had appreciated in value, and that were then collectively worth $43.3 million.  In fact, the only properties Cobalt ever owned were acquired in 2005.

70.     Both 2004 PPMs state that the Units being offered were exempt from registration under the Securities Act because they were only being sold to accredited investors pursuant to Regulation D.  Specifically, to be an accredited investor,  a person had to have a net worth in excess of $1 million or an annual income in excess of $200,000 (or $300,000 if jointly with a spouse) in each of the last two years, and reasonably expect an income of at least that amount in the current year.  However, the Units were in fact sold to numerous investors who were not accredited and who did not meet the financial criteria set forth in Regulation D.

72.     Contrary to the statements contained in the 2004 PPMs, the Units

-19-

were not exempt from registration under the Securities Act.  In fact, the Units were never registered under the Securities Act, although they were required to be.

73.    In exchange for their investments, Cobalt investors were promised an 8% annual return on their investment, which was referred to as a "Priority Return."  In addition, Cobalt investors were informed that they would be entitled to receive a share of the profits from the sale or management of properties.  In fact, Cobalt never had profits or operating revenues and earlier investors were paid with funds received from other later investors, the so-called "Priority Return."

74.    The December 2003 PPM and the 2004 PPMs and Cobalt's marketing materials led Cobalt investors to believe that the promised Priority Return would be funded by cash flow from operations and proceeds of the sale or management of properties.  However, since its inception, Cobalt's only cash flow was the monies raised from investors.  In fact, the promised 8% return was nothing more than a Ponzi Scheme, and any reasonable enquiry by the Professional Defendants would have ascertained that.  Many Cobalt investors received distributions, which purportedly represented such 8% return.  However, what Cobalt investors received was a portion of new Cobalt investors' investments in Cobalt.  Thus, investor funds were used to pay promised returns, contrary to the representations in the 2004 PPMs.

75.    The July 2004 PPM also represented that investor funds would be held in escrow until the minimum offering was sold and $2 million was raised. In fact, investor funds were not held in escrow until the minimum offering had been sold.

-20-

**D. Cobalt's Deceptive Marketing Practices**
   **And The Misappropriation Of Investor Funds**

76.     In furtherance of their scheme, and in order to sell the Units, Shapiro, Stitsky and Foster established a Cobalt office in Great Neck, Long Island, and later an office in Miami Beach, Florida.  Both offices were primarily used by Cobalt's commissioned salespersons to solicit prospective investors in Cobalt Multifamily. Stitsky was responsible for hiring, training and supervising the Cobalt sales force, and also directly participated in selling the Cobalt Multifamily investment. During the course of the scheme, the Cobalt sales force made thousands of telephone calls, including interstate telephone calls.

77.     Among other things, members of the Cobalt sales force told investors that: (a) Cobalt had been in business for two decades or longer, when in fact the Cobalt entities were recently formed and had no operating histories; and (b) Cobalt owned certain properties described in its marketing materials, including, for example, the Hotel Simone, when in truth and in fact, no Cobalt entity ever owned the Hotel Simone. These false claims were also included in certain marketing materials distributed by Cobalt to prospective investors.

78.     Directly and through Cobalt salespeople, Shapiro, Stitsky and Foster have made similar misrepresentations in oral sales presentations to Cobalt investors and prospective investors.  For example, Stitsky told at least one prospective investor that Cobalt had redeveloped a successful hotel in Miami called the Mercury, which is not true.  At the direction of Shapiro, Stitsky and Foster, Cobalt salespeople also frequently led Cobalt investors and prospective investors to believe that Cobalt had

purchased the Simone Hotel and that its value had already doubled, when in fact Cobalt never owned the property.

79.    All of the material misrepresentations and fraudulent statements made to Class A Members and prospective investors (either verbally or through marketing brochures and materials, and the PPMs), were either made directly by Shapiro, Stitsky or Foster, or were made at their explicit direction and control.

80.    Investors were not informed by the sales force, by the PPMs or by the marketing materials distributed by Cobalt, of the fact that Shapiro, the defendant, owned and controlled Cobalt, and were instead misled into believing that Foster actually ran Cobalt.

81.    Cobalt investors were not informed that Shapiro had previously been convicted of bank fraud and conspiracy to commit tax fraud.

82.    Most Cobalt investors and prospective investors were not informed of the involvement of Stitsky in raising funds from investors, and were likewise not informed of Stitsky's criminal history.

83.    Contrary to the representations made in each of the PPMs, the funds received from Cobalt investors were not held in escrow until the minimum offering of $2 million was sold. In fact, Shapiro, Stitsky and Foster deposited and caused others to deposit all investor checks into various Cobalt bank accounts from which the investor funds were either promptly spent or transferred to other bank accounts for the benefit of Cobalt, Shapiro, Stitsky, Foster, and others.

84.    During the period between in or about July 2004 through in or about December 2005, Cobalt raised approximately $22 million from investors.  The majority

of the funds raised by Cobalt were used for the personal benefit of Shapiro, Stitsky and Foster.

85.    For example: (a) the company performing construction work at Shapiro's Glastonbury, Connecticut home received hundreds of thousands of dollars, (b) Foster, and a trust established by Foster for the benefit of himself and others, collectively received hundreds of thousands of dollars; (c) Shapiro received tens of thousands of dollars, in addition to numerous expensive sports cars, and the use of a condominium apartment in Miami Beach, Florida; and (d) Stitsky, and a trust established by Stitsky for the benefit of himself and others, collectively received approximately $185,000.

86.    In excess of $9 million raised from the sale of Cobalt Multifamily Units were transferred from the Cobalt Capital Account to a bank account held in the name of Vail (the "Vail Account") from which further transfers were made for the benefit of Shapiro, Stitsky and Foster.  Funds in the Vail Account were used to pay for: (a) hundreds of thousands of dollars of construction costs for Shapiro's Glastonbury, Connecticut home; (b) hundreds of thousands of dollars in restitution obligations owed by Shapiro arising from his criminal bank fraud and conspiracy convictions; and (c) hundreds of thousands of dollars of other personal expenses including, for example, jewelry, automobiles, and doctors' fees.  In addition, Stitsky and Foster received tens of thousands of dollars from the Vail Account.

87.    Notwithstanding language in the 2004 PPMs that investor funds would only be used for the benefit of Cobalt, Shapiro and Stitsky received loans and

advances totaling more than approximately $136,000. Shapiro also caused tens of thousands of dollars of personal expenses that he charged on Cobalt corporate credit cards to be paid for with investor funds. Cobalt was never reimbursed for such loans and credit card expenses.

88.     The misrepresentation, omissions, and other wrongdoings set forth above were known by the Professional Defendants, but they did not halt the PPMs from being issued or correct them when issued. Moreover, the Professional Defendants did not protect Cobalt from the conduct of Shapiro, Stitsky or Foster, or the effects of their wrongdoing.

## E.  The FBI Raid

89.     On or about December 1, 2005, The FBI executed a search warrant and seized dozens of Cobalt's files at Cobalt's offices in Springfield, Massachusetts, as part of a federal criminal investigation into Cobalt's activities.

90.     On that same day, the Department of Justice seized more than $490,000 of investor funds from accounts maintained by Cobalt at various banks.

91.     Indeed, prior to December 2005, the United States Attorney's Office and the SEC were investigating Shapiro, Stitsky and Foster for the criminal conduct described herein. Unger and Certilman were so informed.

## F.  The PPM Amendment

92.     After the FBI raid on or about December 1, 2005, Cobalt prepared an amendment to the December 2004 PPM, purporting to disclose Shapiro and Stitsky's criminal past. Shapiro, Stitsky and Foster, with the aid of some or all the Professional Defendants, including but not limited to Certilman and Unger,  back-dated the

amendment to November 30, 2005, the day before the FBI raid (the "PPM Amendment").

93.    Nevertheless, the PPM Amendment failed to mention the fact that the FBI had seized most of Cobalt's books and records, as well as investor funds in excess of $490,000.  The PPM Amendment also failed to disclose that both the SEC and the US Attorney for the Southern District of New York were investigating Cobalt's operations and fund raising activities.

## G.  The Malpractice Allegations Against the Legal Professionals

### 1.  Cohen and Cohen & Werz

94.    Cohen and Cohen & Werz were counsel for Cobalt on numerous matters.  Cohen and Cohen & Werz were intimately familiar with Cobalt's operations, and personally dealt with Shapiro, Stitsky and Foster.

95.    On information and belief, Cohen and Cohen & Werz provided legal services to Cobalt in connection with the creation of Vail.  Cohen served as the trustee of Vail.  During his tenure as trustee of Vail, Cohen permitted Shapiro to effect numerous transactions designed to conceal Shapiro's misappropriation and misuse of investor funds.

96.    Cohen and Cohen & Werz were aware of Shapiro's and Stitsky's prior criminal convictions, SEC proceedings, prison time, and other investigations, as are set forth above.  Despite such knowledge, Cohen and Cohen & Werz performed legal services for Cobalt, including creating Vail, all at the direction of Shapiro.

97.    Cohen is the named trustee of Vail.  Upon information and belief, in

excess of $9 million of Cobalt investor money was improperly transferred to Vail, with the full knowledge and consent of Cohen and Cohen & Werz.  Cohen and Cohen & Werz then improperly distributed to Shapiro, Stitsky, Foster and entities established for their personal benefit such Cobalt investor money that had been transferred to Vail. Similarly, Cohen and Cohen & Werz improperly paid from Vail accounts that contained Cobalt investor money personal bills and expenses for Shapiro, Stitsky, Foster and entities established for their personal benefit.

98.    In total, Cohen and Cohen & Werz improperly distributed directly to Shapiro, Stitsky, Foster and entities established for their personal benefit, or paid bills incurred on their personal behalf, in excess of $9 million of Cobalt investor money that had been transferred to Vail.

99.    Specifically, Cohen and Cohen & Werz made payments in excess of $1 million on a home for Shapiro in Glastonbury, Connecticut from Vail bank accounts that exclusively contained Cobalt investor money.  Such payments served no legitimate corporate purpose, and were made solely to benefit Shapiro personally.

100.    Additionally, Cohen and Cohen & Werz made payments in excess of $1.1 million on a condominium apartment in Miami Beach, Florida  (the "Icon Condominium") for Shapiro's personal use from Vail bank accounts that exclusively contained Cobalt investor money.   Such payments served no legitimate corporate purpose, and were made solely to benefit Shapiro personally.

101.    Cohen, as trustee for, on information and belief, Cobalt or a Cobalt-related entity, also owns another condominium apartment in Miami Beach, Florida, in a building known as The Mercury.

102.   On information and belief, Cohen and Cohen & Werz made payments totaling thousands of dollars to either obtain or maintain the Mercury Condominium for Shapiro's personal use from Vail bank accounts that exclusively contained Cobalt investor money.  Such payments served no legitimate corporate purpose, and were made solely to benefit Shapiro personally.

103.   Additionally, Cohen and Cohen & Werz made payments in excess of $100,000 on exotic cars for Shapiro's personal use from Vail bank accounts that exclusively contained Cobalt investor money.  Such payments served no legitimate corporate purpose, and were made solely to benefit Shapiro personally.

104.   After the December 1, 2005 FBI seizure of Cobalt's bank accounts holding investor funds, in order to assist Shapiro, Stitsky and Foster conceal recently received investor funds, Cohen and his firm opened numerous bank accounts in Cohen's name "as trustee" for various Cobalt entities.  In doing so, Cohen and his law firm facilitated, directly and indirectly, Shapiro, Stitsky and Foster's fraud on Cobalt's investors.

105.   The December 2004 PPM provides that each $100,000 Unit purchased by investors would be placed in an escrow account for which Cohen was the trustee.  In fact, Cohen and his firm failed to hold such investment proceeds in escrow, and improperly disbursed such funds.

106.   On information and belief, Cohen & Werz received substantial fees from Cobalt in connection with the legal services provided as described above.

107.   On information and belief, Cohen, as a partner in Cohen & Werz,

received substantial portions of the fees received by Cohen & Werz from Cobalt.

## 2. Unger and Certilman

108.    Unger and Certilman were counsel for Cobalt on numerous matters. Accordingly, Unger and Certilman were intimately familiar with Cobalt's operations, and personally dealt with Shapiro and Stitsky.

109.    On information and belief, Unger and Certilman provided legal services to Cobalt in connection with the December 2004 PPM and the PPM Amendment. Specifically, on information and belief, Unger and Certilman reviewed drafts and commented on the December 2004 PPM and the PPM Amendment.

110.    Unger and Certilman were aware that (a) the NASD barred Stitsky from the securities industry; (b) Stitsky had consented to an SEC order finding that he had violated the anti-fraud provisions of the Securities and Exchange Acts, and barring him from association with any broker, dealer, investment company, investment adviser, or municipal securities dealer; (c) in another SEC administrative proceeding against him, Stitsky was again found to have violated the anti-fraud provisions of the Securities and Exchange Acts, and barred from participating in a penny stock offering and from associating with a broker or dealer; (d) Stitsky pleaded guilty to conspiracy to commit securities fraud in Dacunto; (e) Stitsky pleaded guilty to conspiracy to commit tax fraud in Napolitano; (f) Stitsky pleaded guilty to conspiracy to making false statements in Stitsky; (g) Stitsky was indicted for securities fraud and other crimes in Collardeau; and (h) Stitsky spent time in federal prison in connection with his criminal convictions, and was on probation at the time of his release.

111.    Despite such knowledge, in September 2004, Certilman and Unger

provided Cobalt with an opinion letter knowing that such letter would be used in connection with the December 2004 PPM and thereby to solicit money from investors. Such letter stated that nothing in the SEC's orders prohibited Stitsky from working for Cobalt. In fact, the SEC's orders specifically prohibited Stitsky from doing the work he did for Cobalt.

112.    Moreover, Unger and Certilman were negligent in failing to advise Cobalt that in order to sell the Units to Cobalt investors and other prospective investors who were not accredited investors, Cobalt needed to become a registered broker-dealer of securities, which Cobalt was not, or to contractually affiliate with a broker-dealer, which Cobalt did not do.

113.    Upon information and belief in or about September 2005, Certilman and Unger knew that Shapiro was misusing investor funds for his own benefit and extracting undisclosed fees from investor funds. Nonetheless, Unger and Certilman did not advise Cobalt that this conduct must be stopped and that the July PPM should be amended.

114.    Had Unger and Certilman discharged their duties to their clients and conducted due diligence, they would have discovered, inter alia, that (a) Cobalt was operating as a Ponzi scheme, in that Cobalt had no positive cash income (other than new investors' investments) with which to pay the promised 8% Priority Return to investors, and (b) Shapiro, Stitsky, and Foster were operating Cobalt and selling the Units to unqualified, non-accredited investors, such that the offerings did not meet the exemption from registration under the Securities Act.

115.    In December 2005, after the FBI raid, Certilman and Unger provided Cobalt with another opinion letter knowing that such letter would be used in connection with the PPM Amendment.  That opinion concluded, incredibly, that Cobalt could withhold from investors and prospective investors that (a) a search warrant was executed on Cobalt by the FBI, (b) the United States Attorney for the Southern District of New York was conducting an investigation into Cobalt, and (c) the United States Securities and Exchange Commission was investigating Cobalt.

116.    Certilman and Unger never advised Cobalt that the FBI's seizure of Cobalt's bank accounts and investor funds should have been disclosed to existing and prospective investors.  Instead, Certilman and Unger advised Cobalt that Cobalt's salesmen need not advise prospective investors that a search warrant had been executed at Cobalt's headquarters and principal sales office.  Moreover, on December 23, 2005 Unger and Certilman incorrectly and falsely advised Foster that Cobalt was not the subject of investigation by the SEC and the Department of Justice.

117.    Indeed, after the FBI raid on December 1, 2005, attorneys for the SEC informed Unger and Certilman, as counsel for Cobalt, that Cobalt should cease raising any additional funds from public investors.

118.    In fact, after the FBI raid on December 1, 2005 -- and after attorneys for the SEC informed Unger and Certilman, as counsel for Cobalt, that Cobalt should cease raising any additional funds -- Cobalt raised more than $3 million from unsuspecting investors by selling additional Units, using the 2004 PPMs.

119.    On information and belief, Unger and Certilman took no steps to stop Cobalt from raising any additional funds after being directed to stop doing so.

Specifically, Unger and Certilman failed to advise Cobalt to stop raising any additional funds.  To the contrary, Unger and Certilman facilitated and enabled such additional fund-raising, by providing the December 23, 2005 opinion letter.

120.    Certilman received substantial fees from Cobalt in connection with the opinion letters it issued, as well as substantial other work it performed for Cobalt in connection with the 2004 PPMs and the PPM Amendment and other projects.

121.    On information and belief, Unger, as a partner in Certilman, received substantial portions of the fees received by Certilman from Cobalt.

### 3.  Lum Danzis and Chapman

122.    Lum Danzis and Chapman provided legal services to Cobalt  by preparing the PPMs.

123.    On information and belief, Lum Danzis and Chapman provided legal services to Cobalt by reviewing drafts and commenting on the PPM Amendment.

124.    The December 2003 and the 2004 PPMs expressly state that Lum Danzis is counsel to the company.  These PPMs state that Lum Danzis provided legal opinions as to several matters in connection with such PPMs.

125.    At the time Lum Danzis and Chapman prepared the PPMs, Lum Danzis and Chapman were aware that although Foster was named president of Cobalt, Cobalt really was run by Shapiro, with Stitsky playing a key management role. At the time Lum Danzis and Chapman prepared the PPMs, Lum Danzis and Chapman were aware that (a) Shapiro had pleaded guilty to one count of bank fraud and one count of conspiracy to commit tax fraud; (b) Shapiro spent time in federal prison in connection

with his criminal conviction, and was on probation at the time of his release; (c) there was a $6.5 million judgment against Shapiro in Florida for fraud; (d) the NASD barred Stitsky from the securities industry; (e) Stitsky had consented to an SEC order finding that he had violated the anti-fraud provisions of the Securities and Exchange Acts, and barring him from association with any broker, dealer, investment company, investment adviser, or municipal securities dealer; (f) in another SEC administrative proceeding against him, Stitsky was again found to have violated the anti-fraud provisions of the Securities and Exchange Acts, and barred from participating in a penny stock offering and from associating with a broker or dealer; (g) Stitsky pleaded guilty to conspiracy to commit securities fraud in <u>Dacunto</u>; (h) Stitsky pleaded guilty to conspiracy to commit tax fraud in <u>Napolitano</u>; (i) Stitsky pleaded guilty to conspiracy to making false statements in <u>Stitsky</u>; (j) Stitsky was indicted for securities fraud and other crimes in <u>Collardeau</u>; and (k) Stitsky spent time in federal prison in connection with his criminal convictions, and was on probation at the time of his release.

126. In fact, at the time Lum Danzis and Chapman met Shapiro at the initial meeting between Lum Danzis and Cobalt, Shapiro informed them that he was on parole and was prohibited from <u>inter alia</u> selling securities.

127. Despite such knowledge of Shapiro's and Stitsky's criminal past, Lum Danzis and Chapman approved of and issued the PPMs, without disclosing such facts to prospective investors. Indeed, Lum Danzis and Chapman drafted the 2004 PPMs to indicate that Cobalt was run by Foster, when they knew that was false. Lum Danzis and Chapman knew that Cobalt was really run by Shapiro, with Stitsky playing a key management role.

128.    Additionally, Lum Danzis and Chapman failed to advise Cobalt that it should include financial statements (audited or unaudited) in the 2004 PPMs and otherwise make accurate and truthful representations regarding its finances and financial prospects.

129.    Additionally, Lum Danzis and Chapman failed to conduct appropriate due diligence to confirm whether any of the material factual statements contained in the 2004 PPMs were accurate and complete.  Moreover, Lum Danzis and Chapman failed to confirm whether Cobalt owned the properties it claimed to in the 2004 PPMs.

130.    Additionally, Lum Danzis and Chapman failed to properly determine as matters of fact whether Cobalt was marketing the Units consistent with the rules for exemption from registration under the Securities Act.

131.    Had Lum Danzis and Chapman conducted and discharged their duties to Cobalt with the appropriate skill and diligence, they would have discovered, inter alia, that (a) Shapiro, Stitsky, and Foster were operating Cobalt as a Ponzi Scheme, in that Cobalt had no positive cash income with which to pay the promised 8% Priority Return to investors (other than new investors' investments), and (b) Shapiro, Stitsky, and Foster were selling Cobalt Units to unqualified, non-accredited investors, such that the offerings did not meet the exemption from registration under the Securities Act.

132.    In the summer of 2004, Lum Danzis and Chapman were provided with Cobalt marketing materials concocted by Shapiro, Stitsky, and Foster, and realized

that such materials contained numerous material inaccuracies.  Lum Danzig did nothing to protect Cobalt from this wrongdoing.

133.  In the summer of 2004, Lum Danzis and Chapman learned Cobalt's offering materials were misleading in that (a) they failed to reveal Shapiro's criminal history and controlling role at Cobalt and (b) failed to disclose Stitsky's criminal history of securities fraud and central role in raising investor funds.

134.  Had Lum Danzis and Chapman fully reviewed the Cobalt marketing materials and made reasonable inquiries of Shapiro, Stitsky and Foster, Lum Danzis and Chapman would have realized that Shapiro, Stitsky and Foster were selling the Cobalt Units to unqualified, non-accredited investors (including pensioners and 401(k) owners), such that the offerings did not meet the exemption from registration under the Securities Act.

135.  Moreover, Lum Danzis and Chapman were negligent in failing to advise Cobalt that in order to sell the Units to prospective Cobalt investors who were not accredited investors, Cobalt needed to become a registered broker-dealer of securities, which Cobalt was not, or to affiliate with a broker-dealer, which it did not do.

136.  Lum Danzis received substantial fees from Cobalt in connection with the 2004 PPMs and the PPM Amendment.

137.  On information and belief, Chapman, as a member of Lum Danzis, received substantial portions of the fees received by Lum Danzis from Cobalt.

## H.  The Criminal Indictment

138.  On April 24, 2006, a grand jury indictment was returned against Shapiro, Stitsky, and Foster for (a) conspiracy to commit securities fraud, mail fraud and

wire fraud, and (b) securities fraud, in the United States District Court for the Southern District of New York (the "Indictment").

139.    In the Indictment, Foster and the other defendants are accused of perpetrating "a scheme to defraud investors by soliciting millions of dollars of funds under false pretenses, failing to invest investors' funds as promised, and misappropriating and converting investors' funds to their own benefit and the benefit of others without the knowledge or authorization of the investors."  Indictment ¶ 12.

140.    The Indictment further alleges that the defendants "deposited and caused others to deposit all investor checks into various Cobalt bank accounts from which the investor funds were either promptly spent or transferred to other bank accounts for the benefit of Cobalt, SHAPIRO, STITSKY, FOSTER, and others." Indictment ¶ 22.

141.    The Indictment echoes the SEC's Complaint in SEC Action, which accuses Foster and the other defendants of misappropriating Cobalt investor funds, operating a Ponzi scheme, and engaging in securities fraud.

### FIRST CAUSE OF ACTION
### (As Against Shapiro, Stitsky and Foster)
### (Common Law Fraud)

142.    Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 144 hereof.

143.    Defendants Shapiro, Stitsky and Foster engaged in the above-referenced wrongdoing, by engaging in overt acts of misrepresentation and omissions.

144.    Shapiro, Stitsky and Foster engaged in such wrongful conduct with

-35-

scienter and the requisite intent to commit fraud.

145.    The wrongful conduct of Shapiro, Stitsky and Foster set forth above proximately caused injury to Plaintiff and Cobalt investors.

146.    Defendants Shapiro, Stitsky and Foster separately, with themselves and others, and in concert wrongfully took and obtained Cobalt investors' money under false pretenses and through deception.

147.  By reason of the foregoing, Defendants Shapiro, Stitsky and Foster are jointly and severally liable to Plaintiffs for fraud and for compensatory damages in amounts to be determined at trial, and for punitive damages, attorneys' fees and interest as allowed by law.

## SECOND CAUSE OF ACTION
### (As Against Shapiro, Stitsky, Foster and Cohen)
### (Conversion)

148.    Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 147 hereof.

149.    Plaintiffs never authorized the transfers of funds in question to Defendants Shapiro, Stitsky, Foster and Cohen and Cohen & Werz.

150.    The unauthorized transfers to Defendants Shapiro, Stitsky, Foster and Cohen were not made in return for any consideration to Plaintiffs.

151.    As a result of the unauthorized transfers from Plaintiffs to Defendants Shapiro, Stitsky, Foster and Cohen, Defendants Shapiro, Stitsky, Foster and Cohen converted millions of dollars that rightfully belong to Plaintiffs.

152.    Defendants Shapiro, Stitsky, Foster and Cohen exercised unauthorized dominion over Plaintiffs' property to the exclusion of Plaintiffs' rights.

153.    The money transferred from Cobalt and Cobalt-related accounts to Defendants Shapiro, Stitsky, Foster and Cohen is identifiable.  The funds are a sum certain taken from Cobalt and Cobalt-related accounts and transferred directly to Defendants Shapiro, Stitsky, Foster and Cohen.

154.    By reason of the foregoing, Defendants Shapiro, Stitsky, Foster and Cohen are jointly and severally liable to Plaintiffs for conversion and for compensatory damages in amounts to be determined at trial, and for punitive damages, attorneys' fees and interest as allowed by law.

## THIRD CAUSE OF ACTION
### (As Against Shapiro, Stitsky and Foster)
### (Breach of Fiduciary Duty and the Duty of Loyalty)

155.    Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 154 hereof.

156.    Defendant Foster, as the President of Cobalt and Cobalt-related entities, owed Cobalt and Cobalt-related entities a duty of loyalty and a fiduciary duty to act in good faith and in the best interests of Cobalt and Cobalt-related entities.

157.    Defendants Shapiro, Stitsky and Foster, as control persons and employees of Cobalt and Cobalt-related entities, each owed Cobalt and Cobalt-related entities duties of loyalty and fiduciary duties to act in good faith and in the best interests of Cobalt and Cobalt-related entities at all times.

158.    Defendants Shapiro, Stitsky and Foster engaged in a course of conduct, as is set forth above, that was inconsistent with their common law duties of loyalty to protect the interests of Cobalt and Cobalt-related entities and to refrain from

doing anything that could result in the injury of Cobalt and Cobalt-related entities. Defendants Shapiro, Stitsky and Foster's conduct has fallen far below the standard of conduct required of employees, officers and control persons.

159.    By reason of the foregoing, Defendants Shapiro, Stitsky and Foster are jointly and severally liable to Plaintiffs for breach of fiduciary duty and the duty of loyalty and for compensatory damages in amounts to be determined at trial, and for punitive damages, attorneys' fees and interest as allowed by law.

## FOURTH CAUSE OF ACTION
### (As Against Shapiro, Stitsky and Foster)
### (Breach of Contract)

160.    Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 159 hereof.

161.    Defendant Foster, as the President of Cobalt and Cobalt-related entities, had a contractual obligation to Cobalt and Cobalt-related entities to act in good faith and in the best interests of Cobalt and Cobalt-related entities.

162.    Defendants Shapiro, Stitsky and Foster, as control persons and employees of Cobalt and Cobalt-related entities, each had a contractual obligation to Cobalt and Cobalt-related entities to act in good faith and in the best interests of Cobalt and Cobalt-related entities.

163.    Defendants Shapiro, Stitsky and Foster engaged in a course of conduct, set forth above, that breached their contractual obligations to Cobalt and Cobalt-related entities.

164.    By reason of the foregoing, Defendants Shapiro, Stitsky and Foster are jointly and severally liable to Plaintiffs for breach of contract and for compensatory

damages in amounts to be determined at trial and for attorneys' fees and interest as allowed by law.

### FIFTH CAUSE OF ACTION
### (As Against Shapiro, Stitsky, Foster and Cohen)
### (Unjust Enrichment)

165.    Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 164 hereof.

166.    The unauthorized transfers complained of herein to Defendants Shapiro, Stitsky, Foster and Cohen from Cobalt's accounts were not made in return for any consideration to Plaintiffs.

167.    As a result of the unauthorized transfers, Defendants Shapiro, Stitsky, Foster and Cohen have received millions of dollars that rightfully belong to Plaintiffs.

168.    By reason of the foregoing, Defendants Shapiro, Stitsky, Foster and Cohen are jointly and severally liable to Plaintiffs for unjust enrichment and for compensatory damages in amounts to be proved at trial, and for punitive damages, attorneys' fees and interest as allowed by law.

### SIXTH CAUSE OF ACTION
### (As Against Cohen, Cohen & Werz, Unger,
### Certilman, Lum Danzis and Chapman)
### (Breach of Contract)

169.    Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 168 hereof.

170.    As is set forth above, Cohen, Cohen & Werz, Unger, Certilman, Lum Danzis and Chapman each provided legal services to Cobalt and Cobalt-related

entities pursuant to written and verbal agreements.

171.    Pursuant to such agreements, the Professional Defendants each owed contractual duties to Cobalt and its corporate affiliates to provide good and competent legal advice and services and to at all times act in the best interests of Cobalt and its corporate entities.  Pursuant to such agreements, the Professional Defendants could not place the interests of Shapiro, Stitsky and Foster ahead of the interests of Cobalt.

172.    Each of the Professional Defendants breached their written and verbal agreements with Cobalt by taking actions at the direction of Shapiro, Stitsky and Foster and otherwise that did not serve the interests of Cobalt, but instead aided the personal priorities of Shapiro, Stitsky and Foster.  Plaintiffs have been injured thereby and sustained financial damage therefrom.

173.    By reason of the foregoing, Defendants Cohen, Cohen & Werz, Unger, Certilman, Lum Danzis and Chapman are jointly and severally liable to Plaintiffs for breach of contract and for compensatory damages in amounts to be proved at trial, and for attorneys' fees and interest as allowed by law.

### SEVENTH CAUSE OF ACTION
**(As Against Cohen, Cohen & Werz, Unger,
Certilman, Lum Danzis and Chapman)
(Breach of Fiduciary Duty; Breach of the Duty of Loyalty)**

174.    Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 173 hereof.

175.    As is set forth above, the Professional Defendants each provided legal services to Cobalt and Cobalt-related entities pursuant to written and verbal

agreements.

176.    Pursuant to such agreements, the Professional Defendants each owed fiduciary duties and duties of loyalty to their client, Cobalt.

177.    Each of the Professional Defendants breached their fiduciary duties and duties of loyalty to Cobalt by aiding, fostering, facilitating and encouraging the wrongdoing engaged in by Shapiro, Stitsky and Foster.   The Professional Defendants breached their fiduciary duties and duties of loyalty to Cobalt by putting the interests of Shapiro, Stitsky and Foster ahead of those of Cobalt.

178.    By reason of the foregoing, Defendants Cohen, Cohen & Werz, Unger, Certilman, Lum Danzis and Chapman are jointly and severally liable to Plaintiffs for breach of fiduciary duty and breach of the duty of loyalty and for compensatory damages in amounts to be proved at trial, and for attorneys' fees and interest as allowed by law.

## EIGHTH CAUSE OF ACTION
### (As Against Cohen, Cohen & Werz, Unger, Certilman, Lum Danzis and Chapman) (Legal Malpractice and Negligence)

179.    Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 178 hereof.

180.    As is set forth above, the Professional Defendants each provided legal services to Cobalt and Cobalt-related entities.

181. The Professional Defendants each represented to the public that he/it was equipped, qualified and prepared to represent clients completely and competently in matters relating to securities and corporate law.   These representations were made to

Cobalt, which relied on them to its detriment.

182.   At all times relevant hereto, each of the Professional Defendants had a duty to provide Cobalt with qualified and competent attorneys and staff and to render competent advice, representation and assistance in accordance with the standards then prevailing in the community.

183.   The Professional Defendants each had the duty to possess the degree of learning and skill that is ordinarily possessed by attorneys practicing in the areas in which they represented that they practiced, including in particular the fields of federal and state securities law and corporate law.

184.   As is set forth above, the Professional Defendants each failed to provide legal advice to Cobalt and Cobalt-related entities consistent with ordinary applicable community standards, and committed legal malpractice and negligence in connection with the legal advice and services they respectively provided to Cobalt and Cobalt-related entities.

185.   Such legal malpractice and negligence proximately caused injury to Plaintiffs and they sustained damages therefrom.

186.   By reason of the foregoing, Defendants Cohen, Cohen & Werz, Unger, Certilman, Lum Danzis and Chapman are jointly and severally liable to Plaintiffs for legal malpractice and for compensatory damages in amounts to be proved at trial, attorneys' fees and interest as allowed by law.

## NINTH CAUSE OF ACTION
### (As Against Cohen and Cohen & Werz)
### (Aiding and Abetting Fraud, Conversion and Breach of
### Fiduciary Duty and Duty of Loyalty)

187.    Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 186 hereof.

188.    Defendants Cohen and Cohen & Werz deliberately aided and abetted Shapiro's, Stitsky's and Foster's fraud, conversion, breach of fiduciary duty and duty of loyalty by engaging in the conduct described above.

189.    The conduct set forth above by Cohen and Cohen & Werz proximately caused injury to Plaintiffs and they sustained damages therefrom.

190.    By reason of the foregoing, Defendants Cohen and Cohen & Werz are liable to Plaintiffs for aiding and abetting fraud, conversion, breach of fiduciary duty and duty of loyalty and for compensatory damages in amounts to be proved at trial, and for punitive damages, attorneys' fees and interest as allowed by law.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against each Defendant, jointly and severally, as follows:

A.  On the First Cause of Action (as against Shapiro, Stitsky and Foster), compensatory damages in amounts to be determined at trial, plus punitive and exemplary damages, attorneys' fees and interest as allowed by law;

B.  On the Second Cause of Action (as against Shapiro, Stitsky Foster and Cohen), compensatory damages in amounts to be determined at trial, plus punitive and exemplary damages, attorneys' fees and interest as allowed by law;

C.  On the Third Cause of Action (as against Shapiro, Stitsky and Foster), compensatory damages in amounts to be determined at trial, plus punitive and exemplary damages, attorneys' fees and interest as allowed by law;

D.  On the Fourth Cause of Action (as against Shapiro, Stitsky and Foster), compensatory damages in amounts to be determined at trial, plus punitive and exemplary damages, attorneys' fees and interest as allowed by law;

E.  On the Fifth Cause of Action (as against Shapiro, Stitsky, Foster and Cohen), compensatory damages in amounts to be determined at trial, plus punitive and exemplary damages, attorneys' fees and interest as allowed by law;

F.  On the Sixth Cause of Action (as against Cohen, Cohen & Werz, Unger, Certilman, Lum Danzis, and Chapman), compensatory damages in amounts to be determined at trial, plus attorneys' fees and interest as allowed by law;

G.  On the Seventh Cause of Action (as against Cohen, Cohen & Werz, Unger, Certilman, Lum Danzis, and Chapman), compensatory damages in amounts to be determined at trial, plus attorneys' fees and interest as allowed by law;

H.  On the Eighth Cause of Action (as against Cohen, Cohen & Werz, Unger, Certilman, Lum Danzis and Chapman), compensatory damages in amounts to be determined at trial, plus attorneys' fees and interest as allowed by law; and

I.  On the Ninth Cause of Action (as against Cohen, Cohen & Werz), compensatory damages in amounts to be determined at trial, plus punitive and exemplary damages, attorneys' fees and interest as allowed by law.

Plaintiffs demand trial by jury.

Dated:  New York, New York
        August 25, 2006

                              PADUANO & WEINTRAUB LLP


                              By:_____ ( JG 2120)
                                  Leonard Weintraub (LW 7258)
                                  Joseph E. Gasperetti (JG 2120)
                                  1251 Avenue of the Americas
                                  Ninth Floor
                                  New York, New York 10020
                                  (212) 785-9100
                                  Attorneys for Plaintiffs

-45-