UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

COBALT MULTIFAMILY INVESTORS I,
LLC, et al.,

                Plaintiffs,

                                                    06 Civ. 6468 (KMW) (MHD)

    -against-

                                                OPINION AND ORDER

MARK A. SHAPIRO, et al.,

                Defendants.

------------------------------------------------------------X

KIMBA M. WOOD, U.S.D.J.:

      In August 2006, the court-appointed receiver (the "Receiver") for Plaintiffs Cobalt

Multifamily Investors I, LLC, and its related entities (collectively, "Cobalt"), filed suit against

three sets of attorneys and their law firms who provided professional services to Cobalt before it

collapsed.  These attorneys and their law firms (collectively, the "Law Firm Defendants") are:

(1) Robert F. Cohen and his firm Cohen & Werz, LLC (collectively, the "Cohen Defendants");

(2) Martin P. Unger and his firm Certilman Balin Adler & Hyman, LLC (collectively, the

"Certilman Defendants"); and (3) Philip Chapman and his firm Lum Danzis Drasco & Positan

LLC (collectively, the "Lum Defendants").  The Receiver also filed claims in this action against

Cobalt's principals, Mark A. Shapiro ("Shapiro"), Irving J. Stitsky ("Stitsky"), and William B.

Foster ("Foster") (collectively, the "Cobalt Principals").  After the Cobalt Principals were

convicted of securities fraud relating to their management of the Cobalt entities, the claims

against them were voluntarily dismissed by the Receiver.  (Dkt. No. 63.)

      On March 28, 2008, the Court granted the Law Firm Defendants' motions to dismiss the

Receiver's Complaint on the ground that the Receiver lacked standing to bring the claims.

*Cobalt v. Multifamily Investors I, LLC v. Shapiro*, No. 06-cv-6468, 2008 WL 833237 (S.D.N.Y. Mar. 28, 2008) (hereinafter "the 2008 Dismissal Order").  (Dkt. No. 58.)  In light of the Second Circuit's partial reversal of *Ernst & Young v. Bankr. Servs. (In re CBI Holding Co.)*, 318 B.R. 761 (S.D.N.Y. 2004), *rev'd in part*, 529 F.3d 432 (2d Cir. 2008), upon which this Court had based its decision, the Receiver moved for reconsideration of the Law Firm Defendants' motions to dismiss.  (Dkt. No. 75.)  The Court granted the motion for reconsideration on the ground that failure to do so would result in clear error.  (Dkt. No. 85.)

On July 15, 2009, upon reconsideration, the Court granted in part and dismissed in part the motions to dismiss, concluding that the Receiver had standing to bring only: (1) legal malpractice claims against the Law Firm Defendants; (2) aiding and abetting conversion, breach of contract, and breach of fiduciary duties claims against the Cohen Defendants; and (3) a conversion and unjust enrichment claim against only Cohen.  *Cobalt v. Multifamily Investors I, LLC v. Shapiro*, No. 06-cv-6468, 2009 WL 2058530 (S.D.N.Y. July 15, 2009) (hereinafter "the 2009 Partial Dismissal Order").  (Dkt No. 85.)

On December 23, 2009, in an unrelated case, the Second Circuit certified to the New York Court of Appeals a series of questions relating to the application of the "adverse interest" exception to the *Wagoner* rule and the related "sole actor" exception.  *Kirschner v. Grant Thornton LLP*, 2009 WL 1286326 (S.D.N.Y. Apr. 14, 2009) (*Kirschner I*), *questions certified sub nom. Kirschner v. KPMG LLP*, 590 F.3d 186 (2d Cir. 2009) (*Kirschner II*), *answering certified questions*, 15 N.Y.3d 446 (2010) (*Kirschner III*), *aff'd*, 626 F.3d 673 (2d Cir. 2010) (*Kirschner IV*).  Upon the application of the Certilman Defendants, the Court granted a stay of discovery pending the New York Court of Appeals' decision on the ground that the decision would impact adjudication of the claims pending in this litigation.  (Dkt. No. 116.)

2

After the New York Court of Appeals issued its decision in *Kirschner III*, the Law Firm Defendants moved for reconsideration of this Court's 2009 Partial Dismissal Order.  (Dkt. Nos. 126, 128, 130.)  By report and recommendation, dated September 9, 2011 (the "Report"), familiarity with which is assumed, Magistrate Judge Michael H. Dolinger recommended that the motions be denied.  Specifically, the Report concluded that: (1) *Kirschner III* did not constitute an intervening change in controlling law, and (2) the Court's 2009 Partial Dismissal Order did not constitute clear error.  (Report 25.)  The Law Firm Defendants each filed timely written objections to portions of the Report.

The Court has carefully reviewed the Report's thorough analysis and the parties' corresponding objections.  For the reasons set forth below, the Court GRANTS the Law Firm Defendants' motions to reconsider on the ground that failure to do so would result in clear error.  Upon reconsideration, the Court GRANTS IN PART and DENIES IN PART the Law Firm Defendants' motions to dismiss and DENIES the Receiver's request for leave to replead.  The Court DENIES the Lum Defendants' motion to dismiss for failure to timely file an affidavit of merit pursuant to N.J. Stat. Ann. § 2A:53A-27, (Dkt. No. 134), and GRANTS the Receiver's cross-motion for an extension of time to file the required affidavit *nunc pro tunc*. (Dkt. No. 141.)

## I. BACKGROUND[1]

### A. Facts

The Complaint alleges that the Cobalt Principals engaged in a massive fraud by using Cobalt to perpetrate a Ponzi scheme, which included their making egregious misrepresentations in order to persuade members of the public to invest millions of dollars in the enterprise.  In the

---

[1] The Court adopts in full the Report's comprehensive analysis of the facts and procedural history of this case.  (Report 3-19.)  That material is recapitulated here insofar as it is relevant to the instant motion; readers are referred to the Report—and this Court's prior decisions—for a more detailed account.

written materials disseminated to potential and actual investors, the Cobalt Principals allegedly misrepresented: (1) their personal and professional backgrounds, including their past criminal histories; (2) Stitsky's and Foster's involvement in Cobalt; (3) their plans for the investors' funds; and (4) the nature and scope of Cobalt's property holdings.  The Cobalt Principals are alleged to have appropriated the majority of the funds invested in Cobalt for their own personal use.

The Complaint alleges that each of the Law Firm Defendants, as counsel for the Cobalt entities in varying capacities, assisted the Cobalt Principals in committing investor fraud.  The Cohen Defendants are alleged to have, *inter alia*, aided in the creation of Vail Mountain Trust ("Vail"), an entity created by Shapiro in order to conceal his misappropriation of investor funds. (Compl. ¶¶ 94-95.)  The Complaint alleges that the Cohen Defendants facilitated the transfer of over $9 million in investor funds from Cobalt to Vail, and from Vail to the Cobalt Principals for their personal expenses.  (Compl. ¶¶ 97-103.)

The Complaint alleges that the Certilman Defendants, *inter alia*: (1) approved several private placement memoranda ("PPMs") issued to investors, which they knew contained material misrepresentations; (2) failed to perform due diligence that would have revealed that Cobalt was being operated as a Ponzi scheme with no positive cash flow; and (3) despite knowing that Shapiro was misusing investor funds for personal use, failed to apprise Cobalt of that fact or suggest that it be disclosed to investors.  (Compl. ¶¶ 108-21.)

The Complaint alleges that the Lum Defendants, *inter alia*: (1) prepared and approved PPMs that they knew contained material misrepresentations; and (2) failed to perform due diligence that would have revealed that Cobalt was being operated as a Ponzi scheme with no positive cash flow.  (Compl. ¶¶122-33.)

### B. Procedural History

#### 1. The 2008 Dismissal Order

In October 2006, the Law Firm Defendants filed motions to dismiss, arguing, *inter alia*, that the Receiver lacked standing to file suit, pursuant to the rule of standing articulated in *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 117 (2d Cir. 1991).  (Dkt. Nos. 21, 23, 26.)  The so-called *Wagoner* rule stands for the well-settled proposition that a bankrupt corporation, and by extension, an entity that stands in the corporation's shoes, lacks standing to assert claims against third parties for defrauding the corporation where the third parties assisted corporate managers in committing the alleged fraud.  *Wagoner*, 944 F.2d at 120; *In re Bennett Funding Grp., Inc.*, 336 F.3d 94, 99-100 (2d Cir. 2003).[2]

The Receiver argued that the Court should apply the "adverse interest" exception to the *Wagoner* rule, which states that where an individual corporate principal has "*totally abandoned* [the corporation's] interests and [is] acting *entirely* for his own or another's purposes," *Kirschner III*, 15 N.Y.3d at 466 (quoting *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784-85 (1985)) (emphasis in original), *Wagoner* does not apply, and the corporation has standing to assert claims against a third party that assisted the corporate agent in defrauding the corporation.

The Court rejected the Receiver's argument, finding that the Cobalt Principals had not totally abandoned the interests of the corporation because the Complaint alleged that they had provided at least some financial benefit to the Cobalt entities, such as: (1) using corporate funds accumulated by the fraud to pay promised returns to some investors; and (2) misappropriating most, but not *all*, of the funds raised from investors.  2008 Dismissal Order, 2008 WL 833237 at

---

[2] The *Wagoner* rule is rooted in the law of agency, which generally imputes the misconduct of corporate managers, as agents of the corporation, to the corporation itself.  *See Wight v. BankAmerica Corp.*, 219 F.3d 79, 86-87 (2d Cir. 2000).

*4.  Accordingly, the Court held that the Receiver lacked standing pursuant to the *Wagoner* rule and granted the Law Firm Defendants' motions to dismiss in their entireties in March 2008.

### 2.  *Motion for Reconsideration of the 2008 Dismissal Order; the 2009 Partial Dismissal Order*

In June 2008, the Receiver moved for reconsideration of the 2008 Dismissal Order based on the Second Circuit's opinion in *Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co.)*, 529 F.3d 432 (2d Cir. 2008), which reversed a decision upon which this Court had relied.[3]

In *In re CBI Holding Co.*, the principal managers for CBI Holding Companies, Inc. and its subsidiaries (collectively, "CBI") engaged in inventory fraud during fiscal years 1992 and 1993 as part of a scheme to deceive the company's lenders.  *Id.* at 439-40.  During that period, CBI's accounting firm stated that the company's consolidated financial statements accurately reflected its financial position.  *Id.* at 440.  The bankruptcy court held that plaintiff BSI, the successor to CBI under its bankruptcy plan, had standing under the adverse interest exception to pursue fraud-based claims against the accounting firm because CBI's management had totally abandoned the corporation's interests.  The district court reversed the bankruptcy court's decision, finding that the total abandonment standard had not been met because there was some evidence that various corporate purposes were served by the managers' fraud.  The Second Circuit reversed the district court, holding that the bankruptcy court's determination did not constitute clear error.

In so doing, the Second Circuit stated that the total abandonment inquiry "looks principally to the intent of the managers engaged in misconduct," and that "[e]vidence that CBI *actually benefitted* from CBI's management's fraud does not make the bankruptcy court's

---

[3] The Court notes that the undersigned was the presiding judge in the case reviewed by the Second Circuit, *Ernst & Young v. Bankr. Servs., Inc. (In re CBI Holding Co.)*, 318 B.R. 761 (S.D.N.Y. 2004).

finding that CBI's management did not *intend to benefit* the company clearly erroneous." *Id.* at 451 (emphasis in original).  Based on that language, this Court interpreted the Second Circuit to have "concluded that a court can find that a corporation's manager 'totally abandoned' a corporation's interests even if the manager's actions also benefitted the corporation, because the relevant inquiry is whether the manager *intended* to benefit the corporation."  2009 Partial Dismissal Order, 2009 WL 2058530 at *6 (emphasis in original).

In 2008, this Court dismissed the Receiver's claims, holding that the total abandonment standard had not been met because the Complaint pled "at least some financial benefit to the Cobalt entities" as a result of the corporate managers' misconduct.  2008 Dismissal Order, 2008 WL 833237 at *4.  The Court did not consider whether, notwithstanding any financial benefit that had accrued to Cobalt, the adverse interest exception might still apply as long as the Cobalt Principals had intended to totally abandon Cobalt's interests, as *In re CBI Holding Co.* indicated it might.  The Court therefore granted the Receiver's motion for reconsideration.  2009 Partial Dismissal Order, 2009 WL 2058530 at *5-6.

Upon reconsideration, the Court held that, accepting as true all of the facts alleged in the Complaint, the Receiver had sufficiently stated a claim that the Cobalt Principals intended to totally abandon Cobalt's interests.  *Id.* at *8.  The Court therefore held that the adverse interest exception did apply, and concluded that the Receiver had standing to bring the following claims: (1) legal malpractice claims against the Law Firm Defendants; (2) aiding and abetting conversion, breach of contract, and breach of fiduciary duties claims against the Cohen Defendants; and (3) a conversion and unjust enrichment claim against only Cohen.[4]  *Id.* at *12.

---

[4] The Court granted the motions to dismiss with respect to all other claims alleged against the Law Firm Defendants for reasons not relevant to the instant discussion.

### 3.  *Motion for Reconsideration of the 2009 Partial Dismissal Order*

In January 2010, the Court ordered a stay of this case following the Second Circuit's certification to the New York Court of Appeals a series of questions relating to the application of the "adverse interest" exception to the *Wagoner* rule.  *Kirschner v. Grant Thornton LLP*, 2009 WL 1286326 (S.D.N.Y. Apr. 14, 2009) (*Kirschner I*), *questions certified sub nom. Kirschner v. KPMG LLP*, 590 F.3d 186 (2d Cir. 2009) (*Kirschner II*), *answering certified questions*, 15 N.Y.3d 446 (2010) (*Kirschner III*), *aff'd*, 626 F.3d 673 (2d Cir. 2010) (*Kirschner IV*).  The *Kirschner* case was brought by Marc Kirschner, the litigation trustee of Refco, a brokerage corporation forced to declare bankruptcy after it "disclosed that its president and chief executive officer had orchestrated a succession of loans . . . which hid hundreds of millions of dollars of the company's uncollectible debt from the public and regulators" in order to present to investors a falsely positive picture of Refco's finances.  *Kirschner III*, 15 N.Y.3d at 457.

The Second Circuit asked, in relevant part: (1) "whether the adverse interest exception is satisfied by showing that the insiders intended to benefit themselves by their misconduct;" and (2) whether the exception is available only where the insiders' misconduct has harmed the corporation."  *Kirschner II*, 590 F.3d at 194-95.  The Court of Appeals answered the first question "no" and the second question "yes."  *Kirschner III*, 15 N.Y.3d at 477.  It held that intent alone did not result in application of the exception.  Rather, the exception applies only where the corporation did not benefit at all from the fraud.  *Id.* at 467.  The *Kirschner III* Court further stated that the exception would not apply even if the corporation received short term benefits as a result of the fraud but suffered long term harm because of it.  *Id.* at 468-69.

After the Court of Appeals issued its decision, the Law Firm Defendants moved for reconsideration of the 2009 Partial Dismissal Order denying in part their motions to dismiss, on

the ground that *Kirschner III* constituted an intervening change in controlling law.  (Dkt. Nos. 126, 128, 130.)

The motion was referred to Magistrate Judge Dolinger for a Report and Recommendation, familiarity with which is assumed.  The Report concluded that: (1) *Kirschner III* did not constitute an intervening change in controlling law, and (2) the 2009 Partial Dismissal Order did not constitute clear error.  (Report 25.)  Based on these conclusions, the Report recommended that the Court deny the Law Firm Defendants' motions for reconsideration. (Report 41.)  The Report also concluded that the Receiver's claims should be sustained only insofar as they were based on allegations of the looting of Cobalt, which did not benefit the corporation, and could not be sustained based on allegations of actions that accrued a benefit to Cobalt in the form of fraudulently obtained funds, such as the approval of offering memoranda containing false representations.  (*Id.*)

The Law Firm Defendants filed timely objections to the Report, arguing principally that the Report erred in holding that *Kirschner III* did not change controlling law—or at least did not reject this Court's interpretation of the law—and that the Report erred in recommending that the Receiver be permitted to pursue claims based on conduct that harmed Cobalt.  The Court reviews *de novo* those portions of the Report to which timely written objections have been filed.  *See* 28 U.S.C. § 636(b)(1) (2012); Fed R. Civ. P. 72(b).

## II. MOTIONS FOR RECONSIDERATION

For the following reasons, the Court grants the Law Firm Defendants' motions to reconsider its 2009 Partial Dismissal Order on the ground that failure to do so would result in clear error.

### A. **Legal Standard**

Federal Rule of Civil Procedure 54(b) permits a Court to revise "any order or other decision . . . at any time before the entry of judgment." Fed. R. Civ. P. 54(b). A party to the action may request a revision by filing a motion for reconsideration. *Id.* Reconsideration is appropriate only in limited instances, and "a prior order usually may not be changed unless there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr.*, 652 F.3d 277, 288-89 (2d Cir. 2011) (internal quotation marks omitted).

### B. **Analysis**

As previously noted, *Kirschner III* held that if a corporation receives *any* benefit from the fraud, the adverse interest exception will not apply, even if the fraud ultimately causes the corporation to suffer harm in the long term, and even where the insider intended to benefit himself at the corporation's expense. *See* 15 N.Y.3d at 468-69 ("So long as the corporate wrongdoer's fraudulent conduct enables the business to survive—to attract investors and customers and raise funds for corporate purposes—[the total abandonment standard] is not met. . . .").

The Law Firm Defendants argue that *Kirschner III* constitutes a change in controlling law because it implicitly overruled *In re CBI Holding Co.*, in which the Second Circuit held that "[e]vidence that CBI *actually benefitted* from CBI's management's fraud does not make the bankruptcy court's finding that CBI's management did not *intend to benefit* the company clearly erroneous." *In re CBI Holding Co.*, 529 F.3d at 451 (emphasis in original). The Receiver argues

that *Kirschner III* did not change New York law, but rather merely declined to adopt what it described as the Refco trustee's "broad reading [of] *CBI*."  *Kirschner III*, 15 N.Y.3d at 470.

The Receiver is correct that *Kirschner III* did not change New York law; indeed, the Court of Appeals expressly characterized its holding as a "declin[ation] to alter our precedent relating to in pari delicto, and imputation and the adverse interest exception."  *Id.* at 457.  The *Kirschner III* Court explained that the Refco trustee "advocate[d] that we 'adopt the rule of *CBI*, under which the insiders' intent is the touchstone and a short term, illusory benefit to the company does not defeat the adverse interest exception.'"  *Id.* at 470.  After emphasizing that "it is not entirely clear that *CBI* stands for any such far-reaching 'rule,'" *id.*, the Court of Appeals rejected any language in *In re CBI Holding Co.* that could be read to indicate that the adverse interest exception could be satisfied where insiders intended to benefit themselves by their misconduct but also unintentionally benefitted the corporation.  *Id.* at 470-71.

In its 2009 Partial Dismissal Order, this Court interpreted *In re CBI Holding Co.* as standing for the proposition that "a court can find that a corporation's manager 'totally abandoned' a corporation's interests even if the manager's actions also benefitted the corporation, because the relevant inquiry is whether the manager *intended* to benefit the corporation."  2009 WL 2058530 at *6 (emphasis in original).  The Court recognizes that *Kirschner III* expressly rejected this broad reading of *In re CBI Holding Co.*, even if it did not reject the decision itself.  In other words, although *Kirschner III* clarified, rather than changed, controlling law, it is clear that the interpretation this Court used has now been invalidated. Therefore, the Court must reconsider its 2009 Partial Dismissal Order, since failure to do so would result in clear error.

## III.  MOTIONS TO DISMISS

### A.  Legal Standard

Pursuant to Federal Rule of Procedure 12(b)(6) ("Rule 12(b)(6)"), the Law Firm

Defendants move to dismiss the Complaint on the ground that the Receiver lacks standing to

bring the claims alleged therein.[5]  A plaintiff's standing is defeated where wrongdoing is

imputed to it on the face of the pleadings.  In order to survive a motion to dismiss pursuant to

Rule 12(b)(6), a plaintiff must plead sufficient facts "to state a claim to relief that is plausible on

its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible

"when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 129

S.Ct. 1937, 1949 (2009).  The Court must accept as true all well-pleaded factual allegations in

the complaint, and "draw[] all inferences in the plaintiff's favor."  *Allaire Corp. v. Okumus*, 433

F.3d 248, 249-50 (2d Cir. 2006) (internal quotations omitted).

### B.  Choice of Law Issues

The Receiver argues that the claims against the Law Firm Defendants are controlled by

the laws of their respective domiciles, such that New York law governs the Certilman

Defendants, Connecticut law governs the Cohen Defendants, and New Jersey law governs the

---

[5] The Receiver argues that in pari delicto is an affirmative defense under New York law rather than a standing issue, and that it is improper to resolve a motion to dismiss based on an affirmative defense.  The Receiver is correct that under New York law, in pari delicto is an affirmative defense as to which the defendant bears the burden of proof.  *Kirschner III*, 15 N.Y.3d at 459 n.3.  By contrast, the Second Circuit's interpretation of the New York doctrine under the *Wagoner* line of cases functions as "a prudential limitation on standing under federal law."  *Id.*  However, the New York Court of Appeals in *Kirschner III* expressly stated that "in pari delicto may be resolved on the pleadings in a state court action in an appropriate case."  *Id.* That approach is appropriate here, particularly because "there is no practical difference between the [in pari delicto and *Wagoner*] doctrines, for both seek to test whether, on the face of the pleadings, there is wrongdoing imputed to the plaintiffs that prevents them from pursuing their claims."  *In re Refco Secs. Litig.*, 779 F. Supp. 2d 372, 374 n.1 (S.D.N.Y. 2011) (Rakoff, J.).

Lum Defendants.  The Receiver claims that to the extent *Kirschner III* clarifies or changes *In re CBI Holding Co.*, it does so only with respect to the adverse interest exception under New York law, and would therefore apply to the Certilman Defendants only.  He argues that this Court's broad interpretation of *In re CBI Holding Co.* would still apply to the Cohen and Lum Defendants.[6]

The Cohen and Lum Defendants argue that the Receiver, having consistently relied upon New York law in this litigation, is estopped from arguing that New York law does not apply to them, and that, in any case, New York law controls the claims against them.  For the following reasons, the Court finds that the Receiver is not so estopped, and proceeds to conduct a choice of law analysis to determine which law or laws should apply to the claims in this case.

### 1. Estoppel

The Receiver is not estopped from arguing that New York law does not apply to the claims against the Cohen and Lum Defendants.  Judicial estoppel "applies only in situations where a party both takes a position that is inconsistent with one taken in a prior proceeding, and has had that earlier position adopted by the tribunal to which it was advanced."  *Stichting Ter Behartiging Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 45 (2d Cir. 2005) (citing *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)).  Although the Receiver has consistently relied upon New York law in

---

[6] In his brief, the Receiver argues that *In re CBI Holding Co.* is "controlling precedent with respect to what Connecticut, New Jersey and Massachusetts law would be on this issue," and states that the laws of those jurisdictions are consistent with this Court's broad reading of that case.  (Receiver's Mem. of Law in Opp. to Prof'l Defs. Objs. at 15-16.)  However, *In re CBI Holding Co.* was limited to the interpretation of New York law only.  Furthermore, New Jersey and Massachusetts are not within the Second Circuit.  Therefore, to the extent that the Court finds that the claims against the Cohen and Lum Defendants are not governed by New York law, those claims will be governed by the substantive law of the appropriate jurisdictions, and not by *In re CBI Holding Co.*

previous stages of the case, the Court has never adopted his prior position.  Rather, the Court has proceeded on the basis that New York law applies because none of the parties had asked it to decide the choice of law question.

For the same reason, the Law Firm Defendants cannot invoke the law of the case doctrine.  The law of the case doctrine prevents re-litigation of an issue decided at an earlier point in an action only if the "court was ever squarely presented with the question . . . ." *Stichting*, 407 F.3d at 44; *see also* 18B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4478 (2d ed. 2011).  Because the Court has not made a legal decision as to which law or laws apply to the Receiver's claims, the law of the case doctrine does not preclude the Receiver from arguing that the Court do so now.

### 2. *Applicable Law*

In a federal action based on diversity of citizenship, a court applies the choice of law rules of the forum state.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under New York law, the court must resolve, as a threshold matter, whether there is an actual conflict between the bodies of law that each party seeks to have applied.  *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).  An actual conflict exists when a difference in the substantive law of each jurisdiction is relevant to, and has a significant possible effect on, the outcome of the suit.  *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005).  If a conflict exists, then the court must conduct a choice of law analysis.  *Curley*, 153 F.3d at 12.

New York employs an "interest analysis," which "give[s] controlling effect to the law of the jurisdiction which, because of its relation or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation."  *Babcock v. Jackson*, 12 N.Y.2d 473, 481 (1963).  When conducting an interest analysis for any tort claim, the most

"'significant contacts are, almost exclusively, the parties' domiciles and the locus of the [alleged] tort.'" *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir. 1992) (quoting *Schultz v. Boy Scouts of Amer., Inc.*, 65 N.Y.2d 189, 197 (1985)).  With respect to the specific tort of legal malpractice, "a state has a strong interest in regulating the conduct of a law firm [or lawyer] licensed to practice within its borders, and a law firm [or lawyer] consents to be so regulated when it locates its offices in a particular state." *LNC Invests., Inc. v. First Fidelity Bank*, 935 F. Supp. 1333, 1350-51 (S.D.N.Y. 1996) (Mukasey, J.) (applying New York choice of law rules); *accord The Diversified Grp. v. Daugerdas*, 139 F. Supp. 2d 445, 453 (S.D.N.Y. 2001) (Scheindlin, J.) ("A state has a paramount interest in regulating the conduct of attorneys licensed to practice within its borders.")

### 3.  *Application of Law to Fact*

#### a.  A Conflict Exists

As a threshold matter, a conflict exists between New York law and the laws of Connecticut and New Jersey.  The jurisdictions take different approaches to the adverse interest exception to the in pari delicto defense.  As discussed in Part II.B, *supra*, under New York law, any material benefit accruing to a corporation as a result of corporate insiders' fraud precludes the corporation from pursuing claims based on the fraud.  *Kirschner III*, 15 N.Y. 3d at 467.  The adverse interest exception cannot apply even where the only benefit conferred is an extension of the corporation's life.

By contrast, Connecticut and New Jersey do not consider an extension of a corporation's life as a result of fraud to be a material "benefit" sufficient to preclude it from coming within the adverse interest exception to the in pari delicto defense.

In *Reider v. Arthur Andersen, LLP*, 784 A.2d 464 (Conn. Super. Ct. 2001), Robert and Helen Chain ("the Chains"), the sole owners and agents of insurance company First Connecticut, were alleged to have fraudulently directed the funds received for insurance policies to an affiliated corporation they also owned and controlled, and then to their own personal accounts, "with no intent to return [the money] to, or in any way to benefit, First Connecticut." *Id.* at 471. First Connecticut's liquidator brought claims against the company's accounting firm, Arthur Andersen LLP ("Andersen"), for misreporting First Connecticut's financial status to the State Insurance Department.  Andersen claimed that the in pari delicto doctrine barred First Connecticut from bringing suit, because the fraudulent misrepresentations benefited First Connecticut by allowing it to attract new customers, write new insurance policies, and earn new income for the company.  *Id.*  The trial court rejected this argument because the "benefit" was illusory: "'[T]he fact that [the insurer's] existence may have been artificially prolonged pales in comparison with the real damage allegedly inflicted by the diminution of its assets and income. Under such circumstances, the prolonged artificial solvency of [the insurer] benefited only [the insurer's] managers and the other alleged conspirators, not the corporation . . . ." *Id.* (quoting *Schacht v. Brown*, 711 F.2d 1343, 1348 (7th Cir. 1983)).  Because First Connecticut "itself derived no benefit from its continuing service as [the Chains'] private piggy bank," *id.*, it could invoke the adverse interest exception to the in pari delicto defense.[7]

---

[7] Notably, Andersen also argued that because the Chains were the sole shareholders of First Connecticut, the "sole actor" exception to the adverse interest exception applied.  The sole actor rule "imputes the agent's knowledge to the principal notwithstanding the agent's self dealing because the party that should have been informed was the agent itself albeit in its capacity as principal." *In re Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822, 827 (2d Cir. 1997).  The Connecticut court acknowledged the merit of the sole actor rule, stating that where a sole owner loots his own corporation, "it is only fair to impute the self-dealing conduct of the looter to the looted corporation." *Reider*, 784 A.2d at 472.  However, the court declined to apply the sole actor exception to the case, on the theory that the liquidator—the state insurance

New Jersey takes the same approach as Connecticut.  In *NCP Litig. Trust v. KPMG LLP*, 901 A.2d 871 (N.J. 2006), a litigation trust acting as a bankrupt corporation's successor-in-interest brought an action against the corporation's auditor, to recover for negligent failure to uncover fraud by corporate officers.  The New Jersey Supreme Court held that the in pari delicto defense did not defeat the trust's standing on the theories that the participation of other shareholders in the fraud should not prevent innocent shareholders from recovery, and that to permit the auditors to invoke the defense would fail to deter their wrongdoing.  *Id.* at 885-87. Addressing the application of the adverse interest exception, the court stated: "[W]e find that inflating a corporation's revenues and enabling a corporation to continue in business 'past the point of insolvency' cannot be considered a benefit to the corporation."  *Id.* at 888 (quoting *Schacht*, 711 F.2d at 1348); *see also Thabault v. Chait*, 541 F.3d 512, 522 (3d Cir. 2008) (applying *NCP Litig. Trust* to preclude auditor from asserting in pari delicto doctrine in defense of professional negligence claim).

It is clear that a substantive conflict exists between the scope of the adverse interest exception under New York law, on the one hand, and Connecticut and New Jersey law, on the other.  Because it determines the Receiver's standing to sue, the application of the exception has

---

commissioner—was empowered under state statutes and regulations to take action to ensure the continuing solvency of insurance companies, because an insurance company has "unique legal responsibilities to policyholders, creditors, and the general public."  *Id.*

As this Court has discussed in its 2009 Partial Dismissal Order, the sole actor rule does not apply to the instant case because the Receiver has alleged that the Cobalt entities had innocent shareholders who had the authority to stop the fraud and would have done so had they known about it.  2009 WL 2058530 at *10.  Were this not the case, the sole actor rule under both Connecticut and New York law would compel dismissal.  *See Reider*, 784 A.2d at 472; *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1094 (2d Cir. 1995) (holding under Connecticut law that bankruptcy trustee lacked standing to assert actions against alleged third party aider-and-abetter accounting firm where sole shareholder of debtor corporation was alleged to have perpetrated the fraud).

a determinative effect on the outcome of this case.  Therefore, the Court must conduct a choice of law analysis.

### b.  *Choice of Law Analysis*

As discussed in Part III.B.2, *supra*, an interest analysis for a tort claim focuses primarily on the parties' domiciles and the loci of the alleged tort(s).  In this case, the Cohen Defendants are domiciled in Connecticut, the Lum Defendants are domiciled in New Jersey, and the Certilman Defendants are domiciled in New York. (Compl. ¶¶ 22-27.)  The Cobalt entities were organized under Delaware law and maintained principal places of business in Massachusetts. (Compl. ¶¶ 38-44.)  Vail Mountain Trust ("Vail") was established under Connecticut law. (Compl. ¶ 45.)  Shapiro, a citizen of Connecticut, maintained control over Vail at all relevant times, and Cohen served as the Vail trustee.  (Compl. ¶¶ 8, 45.)

The Cohen Defendants are alleged to have aided in the creation of Vail, facilitated the transfer of over $9 million in investor funds to that entity, and then improperly distributed the funds to the Cobalt Principals, either directly or by paying bills incurred on their personal behalf. (Compl. ¶¶ 97-103.)  It is most likely that this conduct occurred in Connecticut, both because the Cohen Defendants' law offices are located there and because Vail was a Connecticut-based trust. The parties' domiciles and likely situs of the alleged malpractice indicate that Connecticut has the greatest interest in the claims against the Cohen Defendants.  Moreover, Connecticut has additional interests in: (1) regulating the conduct of the law firms and lawyers licensed to practice within its borders, and (2) in ensuring the proper administration of trusts that are established under its laws.  By establishing their law practices (and in Cohen's case, also assuming the responsibilities of trustee) in Connecticut, the Cohen Defendants consented to be subject to the regulations promulgated by those states.

In contrast to the Cohen Defendants, the Certilman and Lum Defendants are alleged to have assisted the Cobalt Principals' fraud more indirectly, both by: (1) approving or preparing PPMs issued to investors that they knew contained material misrepresentations and omissions; (2) failing to advise Cobalt of its obligations under the law; and (3) failing to conduct appropriate due diligence that would have revealed Cobalt's operation as a Ponzi scheme, and its failure to comply with certain provisions of the Securities Act of 1933.[8]  The drafting of the PPMs, and the drafting of opinion letters approving those memoranda, most likely occurred in the Defendants' law offices.  As to Defendants' alleged failure to advise Cobalt of its obligations under the law and failure to conduct due diligence, that advice, if given, or that due diligence, if conducted, would also likely have transpired in the Defendants' law offices.

The parties' domiciles and the likely loci of the alleged malpractice indicate that New York and New Jersey, in which the Certilman and Lum Defendants are respectively domiciled, have the greatest interest in the malpractice claims against them.[9]  This is particularly amplified by these states' interest in regulating the conduct of law firms and lawyers who are licensed to practice within their borders.  By establishing their law practices in New York and New Jersey, the Certilman and Lum Defendants, respectively, consented to be subject to those states' regulations.

---

[8] The Complaint's allegations against the Certilman Defendants are more substantive vis-à-vis the Lum Defendants.  In addition to the allegations common to both sets of defendants, the Complaint further alleges that the Certilman Defendants: (1) knew that Shapiro was misusing investor funds for personal use but failed to apprise Cobalt of that fact or suggest that it be disclosed to investors; and (2) was informed by the Securities and Exchange Commission that Cobalt should cease raising additional funds pending investigation yet failed to take steps to stop Cobalt from doing so.  (Compl. ¶¶ 108-21.)

[9] That the sites of the malpractice are not completely clear from the face of the Complaint is not dispositive.  *See, e.g.*, *LNC Invests., Inc. v. First Fidelity Bank*, 935 F. Supp. 1333, 1350-51 (S.D.N.Y. 1996) (Mukasey, J.) (determining that state in which law firm defendant licensed to practice had greatest interest in adjudication of malpractice claim based on failure to advise, despite lack of clarity as to where defendant would have provided advice it failed to give).

The Cohen and Lum Defendants argue that New York law controls the claims against them because the controlling interest is not the regulation of attorney conduct, but rather, the application of an affirmative defense that alleges wrongdoing by Cobalt.  They argue that because New York has the strongest interest in preventing lawsuits brought against third parties by culpable plaintiffs who allegedly participated in the fraud, New York law should govern the application of the in pari delicto defense.  However, the Defendants offer no legal support for the proposition that a New York court would apply one jurisdiction's law to the underlying claim and apply another jurisdiction's law to an affirmative defense to that claim.  Nor could they, because in this Circuit, the law governing an affirmative defense to a claim is the same as the law governing the claim itself.  *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1540-41 (2d Cir. 1997).  Even if claims and the affirmative defenses to those claims could be governed by the laws of different jurisdictions, the states in which the Defendants are domiciled have a greater interest in the application of the defense than New York does.  Because they have the greater interest in litigation of the underlying claims, they have an acute interest in the availability of defenses to those claims.

Therefore, the Court finds that Connecticut law governs the claims against the Cohen Defendants,[10] New Jersey law governs the claims against the Lum Defendants, and New York law governs the claims against the Certilman Defendants.[11]

---

[10] In addition to the legal malpractice claims alleged against them, several additional claims remain against the Cohen Defendants and Cohen in his individual capacity.  These claims are: aiding and abetting conversion, breach of contract, and breach of fiduciary duties, as against the Cohen Defendants, and conversion and unjust enrichment, as against only Cohen.  The parties have not argued for the application of a specific jurisdiction's law to these non-malpractice claims, other than the Cohen Defendants' general argument that New York law should apply to the claims against them.  The Receiver proffers that either Connecticut or Massachusetts law would apply to these claims but argues that further factual discovery is needed before the Court can make a choice of law determination.

### C.  The Receiver's Standing

The Receiver's standing in this case turns on each jurisdiction's interpretation of the adverse interest exception to the in pari delicto defense—to wit, whether the extension of a corporation's life as a result of fraud is a material "benefit" sufficient to preclude that corporation from coming within the adverse interest exception.  As noted, the Complaint alleges that the Cobalt Principals had provided at least some financial benefit to the Cobalt entities, such as: (1) using corporate funds accumulated by the fraud to pay promised returns to some investors; and (2) misappropriating most, but not *all*, of the funds raised from investors.  Therefore, based on the foregoing discussion of the relevant jurisdictions' approach to the issue, the Receiver has standing under Connecticut and New Jersey law to sue the Cohen and Lum

---

The Court agrees with the Receiver that these claims are governed by either Connecticut or Massachusetts law.  With respect to the non-malpractice tort claims, it is likely that Connecticut law governs, because the allegations that form the basis of these claims primarily, if not exclusively, revolve around the Cohen Defendants' creation and administration of the Connecticut-based Vail trust.  The law governing the breach of contract claim is less clear, as it requires a separate interest analysis that focuses on the places of contracting, negotiation, and performance, as well as the parties' domiciles and the location of the subject matter.  Although more information is required, the allegations set forth in the Complaint indicate that either Connecticut or Massachusetts law will apply.

Therefore, to the extent that the Cohen Defendants have moved to dismiss these claims on the ground that *Kirschner III* changes New York law such that the Receiver no longer has standing, the motion is denied because New York law does not govern these claims.  The Court will address any standing issues that may arise under Connecticut or Massachusetts law once it receives the additional facts necessary to conduct a choice of law analysis.

[11] It is possible that the alleged failure of the Certilman Defendants to advise Cobalt properly or conduct due diligence on the company "occurred" in Massachusetts (*i.e.*, had the Certilman Defendants acted in a manner commensurate with their responsibilities, they would have given appropriate advice or conducted due diligence at Cobalt's principal place of business).  However, these actions would just as likely have been taken in the Certilman Defendants' offices, which are located in New York.  Despite the lack of complete clarity with respect to the locus of the tort, the Court finds that New York's interest in regulating the conduct of its attorneys outweighs any interest Massachusetts has in protecting its domiciliaries from out-of-state attorneys who enter that state.  *See LNC Invests., Inc.*, 935 F. Supp. at 1350-51.

Defendants, respectively, but lacks standing under New York law to sue the Certilman
Defendants.

## IV.  THE LUM DEFENDANTS' MOTION TO DISMISS PURSUANT TO NEW JERSEY'S AFFIDAVIT OF MERIT STATUTE

Pursuant to Rule 12(b)(6), the Lum Defendants move to dismiss the claims against them
should this Court decide, as it now has, that New Jersey law applies to those claims.  They argue
that the Receiver's claim must be dismissed because he failed to file an affidavit of merit
pursuant to N.J. Stat. Ann. § 2A:53A-27.  That statute requires a plaintiff alleging a malpractice
claim to serve on the defendant, within 120 days of the filing of the answer to the complaint, an
expert's sworn statement attesting that there exists a "reasonable probability" that the
professional's conduct fell below acceptable standards.[12]  Under New Jersey law, failure to
comply with the statute is considered a failure to state a claim mandating dismissal of the
complaint with prejudice.  *See Ferreira v. Rancocas Orthopedic Assocs,*, 178 N.J. 144, 150 (N.J.
2003).  The statute is substantive state law that federal courts sitting in diversity must apply

---

[12] The statute provides for a 60-day period in which to file the affidavit, with an additional 60
day extension for good cause shown.  The parties' briefs proceed on the assumption that this
Court would have granted the Receiver an extension, such that he would have 120 days in which
to file the document.  The statute provides:

> In any action for damages for personal injuries, wrongful death or
> property damage resulting from an alleged act of malpractice or
> negligence by a licensed person in his profession or occupation,
> the plaintiff shall, within 60 days following the date of filing of the
> answer to the complaint by the defendant, provide each defendant
> with an affidavit of an appropriate licensed person that there exists
> a reasonable probability that the care, skill or knowledge exercised
> or exhibited in the treatment, practice or work that is the subject of
> the complaint, fell outside acceptable professional or occupational
> standards or treatment practices.  The court may grant no more
> than one additional period, not to exceed 60 days, to file the
> affidavit pursuant to this section, upon a finding of good cause.

N.J. Stat. Ann. § 2A:53A-27.

when adjudicating claims governed by New Jersey law.  *Snyder v. Pascack Valley Hosp.*, 303

F.3d 271, 273 (3d Cir. 2002).

The Receiver cross-moves for an extension of time to file an affidavit of merit, to the

extent that the Court finds an affidavit is necessary.  He argues that: (1) the motion to dismiss is

improper and procedurally defective; (2) the doctrines of equitable estoppel and laches bar the

Lum Defendants from seeking dismissal for the Receiver's failure to comply with the statute; (3)

he is not required to file an affidavit of merit because the allegations come within the "common

knowledge" exception to the statute; (4) the time to file set by the statute has not elapsed; and (5)

if the deadline has elapsed, extraordinary circumstances exist such that he should be permitted to

file a late affidavit.

For the following reasons, the Court denies the Lum Defendants' motion to dismiss and

grants the Receiver's cross-motion for an extension of time to file an affidavit of merit.

### A.  Whether the Court May Consider the Motion

The Receiver argues that the Lum Defendants' motion to dismiss is improper because it

raises an issue outside the scope of the standing matter to be addressed in the Law Firm

Defendants' motions for reconsideration of the 2009 Partial Dismissal Order.  He further states

that, even if the Lum Defendants were permitted to raise the affidavit compliance issue, they

needed to do so in their motions for reconsideration rather than in a separately filed motion.

Finally, he argues that the Lum Defendants are estopped from bringing the motion by the

doctrines of equitable estoppel and laches.

These arguments are without merit.  The Receiver himself put the affidavit compliance

issue into play by introducing a choice of law argument in his opposition brief to rebut the claim

that *Kirschner III* changed New York law governing the in pari delicto defense.  Moreover, it

was not until he submitted that opposition brief that he explicitly argued that New Jersey law applied to the Lum Defendants.[13]  The Lum Defendants were therefore not required to raise the argument that the Receiver's claims must be dismissed for failure to comply with the affidavit of merit statute until that time, which they did both in their reply brief and in a subsequent, separate motion to dismiss.

The Receiver's failure to raise the choice of law issue until now also precludes him from invoking the doctrines of equitable estoppel and laches.  A party will be equitably estopped upon a showing that it engaged in conduct, either intentionally or under circumstances that induced reliance, and that the opposing party acted or changed its position to its detriment.  *Knorr v. Smeal*, 178 N.J. 169, 178 (2003).  A party will be barred by laches where it is shown that it engaged in an inexcusable and unexplainable delay in enforcing a known right, and such delay prejudiced the other party.  *Id.* at 180-81.  The Receiver argues that his default, if measured from the date the Lum Defendants filed their Answer, would have occurred on December 29, 2009, yet the Lum Defendants waited over one year before bringing a motion for his failure to comply with the statute, thereby prejudicing the Receiver.  He alleges that he was prejudiced by the delay because during that time, he participated in limited discovery and engaged in extensive motion practice.

However, the Lum Defendants cannot be said to have slept on their rights or induced reliance by their failure to raise an issue that was not applicable until the Receiver argued for the application of New Jersey law to the claims against them.  The Lum Defendants were not

---

[13] The Receiver argues that he first stated that he would base his opposition brief in part on a choice of law argument in a pre-motion conference before this Court.  However, his statements at the conference were not clear enough to put the Lum Defendants on notice such that they were required to raise the issue in their motion to reconsider.  The first time the Receiver ever squarely raised the claim that New Jersey law applies to the Lum Defendants was when he submitted his opposition brief to the motion to reconsider.

required to make the instant motion in December 2009 on the possibility that the Receiver, after proceeding for almost four years on the basis that New York law applied, might at some future point reverse course and argue that New Jersey law governed the claims against them.  Once the Receiver made such an argument, the Lum Defendants promptly raised the issue.  Moreover, even if the Lum Defendants were required to raise the issue after the Receiver's default—which they were not—the Receiver suffered no prejudice by the delay.  No additional discovery took place between the December 28, 2009 deadline for filing the affidavit, and December 23, 2010, when the instant motion was filed, and no additional motions were filed that would not have been filed had there been no delay.

Therefore, the Court may consider the motion, which it now proceeds to do.

### B.  Common Knowledge Exception

The Receiver argues that he is not required to file an affidavit of merit because the claims against the Lum Defendants fall within the "common knowledge" exception to the statute.  The New Jersey Supreme Court first fashioned the common knowledge exception in *Hubbard v. Reed*, 168 N.J. 387, 390 (2001) when it held that an affidavit is not required in malpractice cases where expert testimony is not needed in order to establish the defendant's negligence; that is, where it is not needed to explain that the care, skill or knowledge of the licensed professional falls outside of acceptable professional standards.  Explaining that the statute "is not concerned with the ability of plaintiffs to prove the allegation contained in the complaint, but with whether there is some objective threshold merit to the allegations," the *Hubbard* Court held that an affidavit is not required where the case's merit is apparent to persons who are not experts from the allegations set forth in the complaint.  *Id.* at 394 (internal quotation omitted).  Stated another way, the exception applies "where jurors' common knowledge as lay persons is sufficient to

enable them, using ordinary understanding and experience, to determine a defendant's negligence without the benefit of specialized knowledge of experts." *Id.*

However, the *Hubbard* Court cautioned that the exception is to be construed narrowly, and that in most cases, expert testimony will be required to establish the applicable professional standard of care and a breach of that standard by the defendant. *Id.* at 397. New Jersey courts have therefore limited the exception to cases in which attorneys "failed to fulfill the most basic obligations," such as failing to timely file documents or record property-related documents. *Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone, P.C.*, 783 A.2d 246, 253 (N.J. Super. Ct. App. Div. 2001). Where a factfinder would be required "to evaluate an attorney's legal judgment concerning a complex legal issue," expert testimony is required. *Id.*

The Receiver argues that the misconduct alleged against the Lum Defendants is so obvious on the face of the Complaint that an expert is not required to demonstrate that their actions fell below common industry standards. According to the Receiver, "an expert is not required to opine that it is outside acceptable practices for lawyers to draft knowingly false documents to be distributed to potential investors, hiding such important facts as who is in control of the company and failing to disclose such persons are convicted felons and barred from the securities industry." (Receiver's Mem. in Opp. to Defs.' Mot. to Dismiss at 8.)

Although a layman may intuit that some of the acts alleged above are wrongful, showing that they establish legal liability requires the aid of an expert. The claims against the Lum Defendants arise out of transactional legal advice provided to Cobalt. Whether that advice was negligently given turns on the professional obligations of an attorney preparing securities offering memoranda. What precisely those obligations are can be difficult for practicing lawyers to understand, let alone jurors. For instance, what disclosures are required by securities statutes,

regulations, and industry practices?  To what extent must an attorney investigate representations made to him by his client prior to preparing securities offering memoranda?  The answers to these questions are technical and often discretionary—well outside the purview of jurors' common knowledge.  Simply put, "the questioned conduct [does not] present[ ] such an obvious breach of an equally obvious professional norm that the factfinder could resolve the dispute based on its own ordinary knowledge and experience and without resort to technical or esoteric information."  *Brach, Eichler*, 783 A.2d at 246.

The Receiver is therefore required to provide an affidavit from an appropriate, licensed expert attesting to the reasonable probability of the Lum Defendants' professional negligence.

### C.  Timeliness of Filing and Extraordinary Circumstances

As noted, the statute stipulates that a plaintiff must file its affidavit within 120 days of the defendant's filing of an answer.  In this case, the Lum Defendants filed their Answer on August 31, 2009, giving the Receiver until December 28, 2009 to file an affidavit.  During that 120-day period, a motion by the Certilman Defendants was pending, which sought reconsideration of the Court's 2009 Partial Dismissal Order, or in the alternative, interlocutory appeal to the Second Circuit and a stay of the proceedings.  On November 30, 2009, the motion was denied.  However, on December 23, 2009, just prior to the December 28, 2009 deadline, *Kirschner II* was certified to the New York Court of Appeals.  On January 8, 2010, in light of certification, Certilman Defendants moved for reconsideration of the Court's November 30, 2009 order and for a stay of discovery pending a decision by the Court of Appeals.  On January 12, 2010, the Court granted the stay, which to date has remained in place.

The Receiver argues that the 60-day statutory period was tolled because the case has either been stayed or subject to a motion to stay for all but 45 days since the Lum Defendants

filed their Answer.  He argues that he therefore has 15 days to timely file an affidavit, even

without the benefit of the additional 60-day period that the Court is permitted to grant for good

cause shown.  The Receiver cites no case law to support the theory that a New Jersey court

would consider a motion to stay or a stay imposed *subsequent* to the deadline for filing sufficient

to toll the statute.  *Cf. Hyman Zamft & Manard LLC v. Cornell*, 707 A.2d 1068, 1072 (N.J.

Super. Ct. App. Div. 1998) (suggesting that a mediation order entered *prior* to the deadline for

filing might toll the statutory period).  In the absence of any guidance by New Jersey state courts

on the issue, the Court declines to find that these circumstances toll the running of the statute.

However, the Court does find that the repeated motions for reconsideration and stay of

the proceedings constitute extraordinary circumstances that excuse the Receiver's untimely filing

of an affidavit of merit.  Whether extraordinary circumstances exist to excuse statutory

compliance is a "fact-sensitive" inquiry.  *Chamberlain v. Giampapa*, 210 F.3d 154, 162 (D.N.J.

2000).  "Carelessness, lack of circumspection, or lack of diligence on the part of counsel are not

extraordinary circumstances which will excuse missing a filing deadline."  *Hyman Zamft &*

*Manard LLC*, 707 A.2d at 1071.  In this case, all of the parties operated for several years on the

assumption that New York law governed all of the claims in this litigation, during which the

December 28, 2009 deadline for filing an affidavit of merit under New Jersey law expired.  As of

the deadline, no party had argued for the application of New Jersey law.  The Certilman

Defendants had sought a stay of the proceedings and reconsideration of the Court's 2009 Partial

Dismissal Order, on the ground that the Court had misinterpreted New York law.[14]  Both of these

---

[14] Although the Certilman Defendants brought the motion, there is no doubt that their interests
were aligned with those of the Lum Defendants.  Had the Court accepted the arguments
advanced by the Certilman Defendants, it would have dismissed the claims against both them
and the Lum Defendants.

motions were denied.[15]  On January 8, 2010—only after the deadline for filing the affidavit had

passed—the Certilman Defendants moved for, and were granted, a stay of discovery pending the

New York Court of Appeals' decision in *Kirschner III*.  Throughout the period in which he had

to file his affidavit, the Receiver had no reason to question the applicability of New York law to

this action, and therefore no reason to file the affidavit.  Nor could the Receiver be expected to

file an affidavit after the deadline had passed, since this Court had imposed a stay of discovery

that essentially operated as an implied "time-out . . . sufficient . . . to excuse the failure to timely

file . . . ."  *Hyman Zamft & Manard LLC*, 707 A.2d at 1072.

 Critically, dismissing the case with prejudice does not serve the purpose of the statute,

which is to eliminate frivolous lawsuits.  *See Knorr*, 178 N.J. at 176 ("The statute's essential goal

is to put to rest unmeritorious and frivolous malpractice lawsuits at an early stage of litigation

while allowing worthy claims to proceed through discovery and, if warranted, to trial.").  The

Receiver's claims are not frivolous.  This is demonstrated in part by the trial judge's findings in a

closely related case brought in New York state court.  In *Oster v. Kirschner et al.*, 905 N.Y.S.2d

69 (1st Dep't 2010), Cobalt investors filed claims against the Law Firm Defendants based on the

same misconduct alleged in this litigation.  The *Oster* Court found that the investors adequately

pled actual knowledge and substantial assistance, as required to state a claim for aiding and

abetting fraud under New York law.[16]  *Id.* at 73.  Moreover, there is no evidence that the

---

[15] Magistrate Judge Dolinger denied the motion for a stay of the proceedings on September 17, 2009, to which the Certilman Defendants filed objections.  This Court denied the motion for reconsideration on November 30, 2009 and found the objections to the denial of the stay moot.

[16] To support its finding that the Cobalt investors had adequately pled actual knowledge, the *Oster* Court stated that discovery from the 2006 SEC proceedings against Cobalt demonstrated that "Chapman was well aware of Shapiro and Stitsky's extensive criminal backgrounds, including the fact that Stitsky was banned from the securities industry."  *Id.* at 72.  The Court stated that substantial assistance had been adequately pled where the Lum Defendants "consciously chose to look the other way when their clients asked them to prepare the PPM for

Receiver's failure to timely file an affidavit "evince[s] a knowing intent to disregard and thereby thwart the sound purpose of the statute." *Hyman Zamft & Manard LLC*, 707 A.2d at 1071.

Finally, the Court notes that its acceptance of a late filing will not cause the Lum Defendants to suffer prejudice. From a defendant's perspective, the purpose of the affidavit is to establish whether there is any merit to the claims asserted against it. *See Knorr*, 178 N.J. at 182 ("The affidavit of merit may have proved useful to defendant early in the case when he needed to know whether there was any validity to the complaint."). The Lum Defendants do not allege that the Receiver's failure to provide them with an affidavit has allowed a meritless claim to proceed. Rather, they argue that, had the Receiver argued for the application of New Jersey law earlier, they would have been able to file the instant motion earlier and obtain an earlier dismissal. This claim amounts only to an argument that the Receiver is estopped from now arguing for the application of New Jersey law; the Court has addressed and rejected that argument in Part III.B.1, *supra*.

Because extraordinary circumstances exist to excuse the Receiver's failure to timely file an affidavit of merit, and because acceptance of a late filing will neither frustrate the purpose of the statute nor result in prejudice to the Lum Defendants, the Court will accept the affidavit submitted with the Receiver's cross-motion *nunc pro tunc*.

---

their next 'investment vehicle.'" *Id.* at 73. Refusing to endorse what it termed a "see no evil, hear no evil approach," the Court remarked: "To say that defendant attorneys merely furnished legal services to help solicit investments in . . . Cobalt . . ., and did not have knowledge of the fraud they helped perpetrate, is drawing distinctions based on gradations of knowledge that are simply not tenable." *Id.*

## V.  LEAVE TO REPLEAD

The Receiver requests leave to replead those claims that have been dismissed, *i.e.*, the claims against only the Certilman Defendants.  Federal Rule of Civil Procedure 15(a)(2) provides that "the court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962).  However, leave to amend should be denied where there is an "apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment."  *Foman*, 371 U.S. at 182.  An amendment to a pleading may be considered futile where it would not withstand a motion to dismiss pursuant to Rule 12(b)(6).  *Dougherty v. N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002).

The Court denies the Receiver's motion for leave to replead on the ground that any amendments would be futile.  To cure his lack of standing under New York law, the Receiver would have to allege facts that show Cobalt did not receive any benefit—inadvertent or otherwise—as a result of the Cobalt Principals' fraud.  The Receiver cannot do this without contradicting the allegations of the original Complaint.  The Court therefore DENIES the Receiver's request for leave to replead his claims against the Certilman Defendants.

## VI.  CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the Law Firm Defendants' motions to dismiss pursuant to Rule 12(b)(6) and GRANTS IN PART and DENIES IN PART the Receiver's request for leave to replead.  The Court DENIES the Lum Defendants' motion to dismiss for failure to timely file an affidavit of merit pursuant to N.J.

Stat. Ann. § 2A:53A-27 and GRANTS the Receiver's cross-motion for an extension of time to

file an affidavit of merit *nunc pro tunc*.


      SO ORDERED.

Dated: New York, New York
      March __, 2012


                                  _____
                                         Kimba M. Wood
                                United States District Judge

Stat. Ann. § 2A:53A-27 and GRANTS the Receiver's cross-motion for an extension of time to

file an affidavit of merit *nunc pro tunc*.


SO ORDERED.

Dated: New York, New York
        March 7, 2012

_____
Kimba M. Wood
United States District Judge